UNITED STATES of America,
Plaintiff,

v.

NORTHERN PACIFIC RAILWAY COMPANY and Northwestern Improvement Company, Defendants.

No. 2277.

United States District Court
W. D. Washington, N. D.
June 23, 1956.

Victor R. Hansen, Asst. Atty. Gen.,
Margaret H. Brass, Edward M. Feeney,
Victor H. Kramer, Dept. of Justice,

Washington, D. C., and Charles P. Moriarty, U. S. Atty., Seattle, Wash., for plaintiff.

M. L. Countryman, Jr., St. Paul, Minn., Dean H. Eastman, Harold G. Boggs, Roscoe Krier, Seattle, Wash., for defendants.

BOLDT, District Judge.

By this action the government seeks to have certain contractual provisions contained in deeds and leases granted by defendants held illegal as contravening Section 1 of the Sherman Anti-Trust Act, 26 Stat. 209, 15 U.S.C.A. § 1 et seq.[1] The action is authorized by Section 4 of the Act. Injunctive relief is sought to prevent enforcement of the contract provisions which defendants designate as "preferential routing agreements" and government counsel refer to as "traffic clauses." The terms of the clauses being the same under either designation, for brevity and convenience the latter term will be used herein.

The complaint was filed May 26, 1949. Since then, by answer, interrogatories, depositions and stipulation, many facts have been agreed to. The government moves for summary judgment under Rule 56(a) (c), 28 U.S.C.A., on the undisputed facts. Discretion is not involved in considering the facts and the motion can only be granted to such extent as the law may warrant on facts shown in the record beyond genuine issue.

The material facts thus shown are: Defendant Northern Pacific Railway Company, a Wisconsin corporation (the N. P. herein), is the successor to a land grant railroad which in 1864 was chartered by act of Congress for the purpose of constructing a railroad from Lake Superior to Puget Sound.[2] The N. P. is primarily engaged as a common carrier in the business of transporting passengers and freight in interstate commerce.

Defendant Northwestern Improvement Company, a Delaware corporation (the Land Company herein) and wholly owned subsidiary of the N. P., conducts the business of selling, leasing and managing N. P. lands.

By congressional land grants the N. P. acquired slightly less than 39,500,000 acres of public land located, except for about 100,000 acres, in the area of the states in which the N. P. railway lines are now located, i. e., Wisconsin, Minnesota, North Dakota, Montana, Idaho, Washington and Oregon.

Prior to the commencement of this action much of the granted land had been sold. Defendants now own approximately 2,700,000 acres of land exclusive of land for right-of-way, etc., classified by the Interstate Commerce Commission as for "transportation purposes." Some of the presently owned land was not acquired under the grants of public land. Approximately 21,000,000 acres of land were sold without reservation of any kind. Of the acreage sold with mineral reservations, 6,500,000 acres remain subject to such reservation.

The lands now owned by the defendants, as well as lands which they formerly owned and sold, are of many types. Some contain timber, iron ore, coal, oil and other natural resources. Some of the lands have been used for grazing and agriculture, while still others have been devoted to industrial developments of various kinds.

Traffic clauses in a variety of forms have been included in some of defendants' deeds and in almost all of the leases of lands in each of the categories referred to. The minimal obligation of all of the clauses in question requires the grantee or lessee to route via N. P. railway shipments of commodities produced by or on the land sold or leased, provided neither

1. "Every contract, * * * in restraint of trade or commerce among the several States, * * * is hereby declared to be illegal * * *."

2. For summary of the history of the N. P. land grants see United States v. Northern Pacific Railway Co., 256 U.S. 51, 41 S. Ct. 439, 65 L.Ed. 825 and United States v. Northern Pacific Railway Co., 311 U. S. 317, 61 S.Ct. 264, 85 L.Ed. 210.

a lower rate nor better service be available from a competing line. Typical examples of defendants' traffic clauses are given below.[3]

The government contends that under the stated facts, shown in the record without genuine dispute, the traffic clauses provide for restraints of trade which are unreasonable *per se* and therefore violative of Section 1 of the Sherman Act under principles announced in the "tying" cases.[4] The essence of the contention is that defendants' dominance of N. P. land as a tying commodity or device has been used to foreclose or restrict competition in the tied commodity, transportation service to and from the land, the commerce in which is not "inconsequential or insubstantial" in amount.

Defendants contend that the rules of the tying cases are inapplicable to the facts of the instant case; that if so, neither the necessary dominance over the market in the tying commodity nor the required substantial volume of commerce in the tied commodity appears on the present record; and that defendants are entitled to present proof in support of their affirmative defenses alleging that in practice and effect the restraint of the traffic clauses is reasonable and beneficial.

3. A grazing lease: "All shipments of livestock, wool, mutton or beef made by or for the lessee, destined for points on the line of the Northern Pacific Railway, or its connections, shall be shipped over the Northern Pacific Railway, whenever its freight rates do not exceed the rates over other lines."

A lease of coal lands: "The lessee covenants that all coal removed from the premises as well as from adjacent lands now or hereafter controlled by it, as far as such coal is destined for rail shipment, and all incoming freight destined for use in the field of which the premises are a part, shall be shipped over the Northern Pacific Railway, provided its rates and service shall equal those of any competing line."

A timber contract or a contract for the sale of timberland: "The purchaser agrees, as one of the material considerations of this contract, that rates being equal, he will ship via the Northern Pacific Railway all logs, poles, lumber and other products manufactured from the timber cut under this contract, or an equivalent quantity of lumber and other products manufactured from timber cut from lands *not covered by this* contract. Such shipments shall be made from time to time in the ordinary course of business as the timber is manufactured. Where the point of destination of the manufactured product is not on the line of the Northern Pacific Railway, such shipments shall be routed to favor said railway with the longest haul, if the expense to the purchaser is not increased over the cost of shipment over another rail line. The purchaser shall make monthly reports to the Railway Company of shipments under this provision and shall permit the Railway Company to examine his records at any convenient time or place for the purpose of verifying such reports."

4. Motion Picture Patents Co. v. Universal Film Mfg. Co., 1917, 243 U.S. 502, 37 S.Ct. 416, 61 L.Ed. 871; McBoyle v. United States, 1931, 283 U.S. 25, 27, 51 S.Ct. 340, 75 L.Ed. 816; International Business Machines Corp. v. United States, 1936, 298 U.S. 131, 56 S.Ct. 701, 80 L.Ed. 1085; Leitch Mfg. Co. v. Barber Co., 1937, 302 U.S. 458, 58 S.Ct. 288, 82 L.Ed. 371; Interstate Circuit, Inc., v. United States, 1939, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610; Ethyl Gasoline Corp. v. United States, 1940, 309 U.S. 436, 60 S.Ct. 618, 84 L.Ed. 852; Morton Salt Co. v. G. S. Suppiger Co., 1942, 314 U.S. 488, 62 S.Ct. 402, 86 L. Ed. 363; B. B. Chemical Co. v. Ellis, 1942, 314 U.S. 495, 62 S.Ct. 406, 86 L. Ed. 367; United States v. Masonite Corp., 1942, 316 U.S. 265, 62 S.Ct. 1070, 86 L.Ed. 1461; Mercoid Corp. v. Mid-Continent Investment Co., 1944, 320 U. S. 661, 64 S.Ct. 268, 88 L.Ed. 376; Mercoid Corp. v. Minneapolis Honeywell Regulator Co., 1944, 320 U.S. 680, 64 S. Ct. 278, 88 L.Ed. 396; Hartford Empire Co. v. United States, 1945, 323 U.S. 386, 65 S.Ct. 373, 89 L.Ed. 322; Associated Press v. United States, 1945, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013; International Salt Co. v. United States, 1947, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20; United States v. Griffith, 1948, 334 U.S. 100, 68 S.Ct. 941, 92 L.Ed. 1236; United States v. Paramount Pictures, Inc., 1948, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260; Times-Picayune Publishing Co. v. United States, 1953, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277.

Most, if not all, of the decisions of the United States Supreme Court in tying cases based on either Sherman Act or Clayton Act, 15 U.S.C.A. § 12 et seq., or both, are listed in footnote 4.

■ Not any one of the cited cases is closely apposite in facts to the present case; but the facts of this case bring it squarely within a formula derived from all of the cited cases: When (1) a seller or lessor, enjoying market control of a particular commodity, in contracts for the sale or lease of such commodity, requires buyer or lessee to purchase a distinctly different and separate commodity, and (2) the amount of interstate commerce in the tied commodity is not insignificant or insubstantial, the tying arrangement is illegal *per se* under Section 1 of the Sherman Act.

■ The rationale of the tying doctrine is briefly stated in the latest of the decisions, Times-Picayune Publishing Co. v. United States, 1953, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277:

"Tying arrangements, we may readily agree, flout the Sherman Act's policy that competition rule the marts of trade. Basic to the faith that a free economy best promotes the public weal is that goods must stand the cold test of competition; that the public, acting through the market's impersonal judgment, shall allocate the Nation's resources and thus direct the course its economic development will take. Yet '[t]ying agreements serve hardly any purpose beyond the suppression of competition.' Standard Oil Co. of California v. United States, 1949, 337 U.S. 293, 305, 69 S.Ct. 1051, 1058, 93 L.Ed. 1371. By conditioning his sale of one commodity on the purchase of another, a seller coerces the abdica-

tion of buyers' independent judgment as to the 'tied' product's merits and insulates it from the competitive stresses of the open market. But any intrinsic superiority of the 'tied' product would convince freely choosing buyers to select it over others, anyway. Thus '[i]n the usual case only the prospect of reducing competition would persuade a seller to adopt such a contract and only his control of the supply of the tying device, whether conferred by patent monopoly or otherwise obtained, could induce a buyer to enter one.' Id., 337 U.S. at page 306, 69 S.Ct. at page 1058. Conversely, the effect on competing sellers attempting to rival the 'tied' product is drastic: to the extent the enforcer of the tying arrangement enjoys market control, other existing or potential sellers are foreclosed from offering up their goods to a free competitive judgment; they are effectively excluded from the marketplace.

"For that reason, tying agreements fare harshly under the laws forbidding restraints of trade. * * *" 345 U.S. at page 605–606, 73 S.Ct. at page 878.[5]

The Supreme Court sustained summary judgments finding tying arrangements violations *per se* of the Sherman Act in Associated Press v. United States, 1945, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 and in International Salt Co., Inc., v. United States, 1947, 332 U.S. 392, 68 S. Ct. 12, 92 L.Ed. 20. Application of tying principles is not limited to cases involving monopolies granted by patent and copyright. United States v. Griffith, 1948, 334 U.S. 100, 68 S.Ct. 941, 92 L. Ed. 1236; Times-Picayune v. United States, supra. Specific intent to restrain trade or build monopoly is not nec-

5. Existence of the necessary tying elements was not found in the Times-Picayune case. If in that case defendant newspaper publisher had required by contract provision the purchasers of advertising space to subscribe to defendant's papers, prices and service being

equal to that of competing papers, with substantiality satisfied, the illegality *per se* of the requirement could hardly be doubted. The postulated situation is more analogous to the present case than the facts found in Times-Picayune.

essary for a finding of antitrust law violation and "it is unreasonable, *per se*, to foreclose competitors from any substantial market." United States v. Griffith, supra; International Salt Co., Inc., v. United States, supra.

The traffic clauses in question prohibit grantees and lessees of N. P. lands from a free choice in the selection of transportation routing in the shipment of commodities to and from the lands sold or leased. Admittedly, a large, if not major, portion of such shipments are in interstate commerce. Obviously, the traffic clauses provide at least a nominal "restraint of trade or commerce among the several States". While the Sherman Act provides that "every" contract in such restraint is illegal, ever since Standard Oil Co. of New Jersey v. United States, 1911, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, only unreasonable restraints are held condemned by the Act. Unreasonable restraints are those which tend to create monopoly by restricting consumers or purchasers from enjoyment of the advantages of free competition. Standard Oil Co. of New Jersey v. United States, supra; United States v. American Tobacco Co., 1911, 221 U.S. 106, 31 S.Ct. 632, 55 L.Ed. 663. Among the restraints held to be unreasonable *per se* are those effecting price fixing, boycott and a tying arrangement involving the two elements previously stated.

Defendants argue that the first tying element, i. e., market domination over the tying product, is not established because the record does not show the proportion of N. P. lands of various types to the total of the lands of the same types sold and leased in the area of defendants' operations. This contention ignores the plain language of the cited decisions, providing that market dominance of "the tying commodity" is required. The tying commodity need only be the particular property or product to which forced purchase of the second commodity is tied; certainly it does not necessarily include all of the similar and competing commodities which may be in the market. Restraints of trade to be illegal under Section 1 of the Sherman Act must necessarily *tend* to monopoly but need not fully or substantially achieve it. In International Salt Co. v. United States, supra, market dominance of defendant's particular salt dispenser was held sufficient to sustain the first element of an unreasonable restraint *per se*, even though other dispensers were available in the market. Standard Oil Co. of Cal. v. United States, 1949, 337 U.S. 293, 69 S. Ct. 1051, 1058, 93 L.Ed. 1371, affirms such view of the International Salt Co. decision in the following language: "It was not established that equivalent machines were unobtainable, it was not indicated what proportion of the business of supplying such machines was controlled by defendant, and it was deemed irrelevant that there was no evidence as to the actual effect of the tying clauses upon competition." Defendants urge that United States v. E. I. DuPont de Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 1017, decided after argument of the present case, holds in effect that the market dominance required as the first element of an illegal tying device is synonymous with the monopoly that is a requisite for violation of paragraph 2 of the Sherman Act. DuPont, grounded solely on paragraph 2, was not concerned with a tying arrangement and neither the tying principles nor the decisions in which they have been developed are discussed in the opinion. As the majority opinion indicates and the concurring opinion states: "Sections 1 and 2 of course implicate different considerations." Nothing in the reasoning or language of the Supreme Court decisions requires adoption of defendants' view of the market involved in the first element of the tying formula.

The tying commodity in the present case is the land presently or formerly title to land vests in the owner absolute domination of the market in such land. By the ownership of the lands and resulting dominance in the market therefor defendants were able to impose the traffic

clauses in question on the grantees and lessees of the land.

■ Existence of the second of the tying elements is dependent on the amount of commerce in the tied commodity with, at most, only remote regard to the total amount of commerce in commodities of a like or similar kind in the same market area. The record amply shows that actual or potential commerce in transportation of commodities from the properties subject to the traffic clauses is very substantial, however that commerce may compare with the whole volume of commodity transportation in the area served by N. P.[6] The admitted amount of commerce in transportation restrained by the traffic clauses in each of the categories in question is not inconsequential or insubstantial.

■ The stipulation of the parties filed May 16, 1950 shows that of the approximate 8,000 industrial leases (including grain elevator and grain warehouse leases), with minor exceptions, all grant a use of right-of-way lands. Such lands are an integral part of the property devoted to railway operations and are directly related to transportation, the asserted tied commodity. Whether under such circumstances the industrial leases involve distinct and separate tied and tying commodities, as held required and found lacking in Times-Picayune v. United States, supra,[7] presents at least a question of fact which precludes summary judgment and will require trial as to all issues pertaining to the industrial leases.

■ On the established facts all of the traffic clauses in question, excepting those in the industrial (including grain elevator and grain warehouse) leases, are shown to be violative of Section 1 of the Sherman Act under the principles enunciated in the tying cases. Findings and decree to such effect will be settled at a hearing for the purpose which may be noted at the convenience of counsel.

6. By their Responses to Plaintiff's Request for Admissions under Rule 36, filed January 14, 1952, defendants admitted the existence of the following leases containing traffic clauses, all valid and subsisting as of 1949, the year in which suit was commenced:
   (1) At least 1,000 leases involving more than 1,000,000 acres of grazing lands. (See Response to Request IV.)
   (2) At least 16 leases of iron ore land, covering 5,261 acres. (See Response to Request VII.)
   (3) At least 2 leases of coal lands. (See Response to Request VI.)
   (4) At least 19 oil and gas permits or leases, covering 135,000 acres of land. (See Response to Request V.)
   In addition, defendants admit the existence of the following contracts for the sale of timber or timberland subject to traffic clauses:
   (1) Out of 75 contracts for the sale of timberland, involving over 2,000,000 acres of land and over 21,000,000,000 board feet of timber, at least 42 of such contracts were subject to traffic clauses. (See Response to Request I and Exhibit A.)
   (2) Out of 210 timber contracts, involving more than 390,000 acres of land and more than 6,000,000,000 board feet of timber, at least 157 of such contracts included traffic clauses. (See Response to Request II and Exhibit B.)

7. "The common core of the adjudicated unlawful tying arrangements is the forced purchase of a second distinct commodity with the desired purchase of a dominant 'tying' product, resulting in economic harm to competition in the 'tied' market. * * * *" Times-Picayune v. United States, supra.