NORTHERN PACIFIC RAILWAY CO. ET AL. *v.*
UNITED STATES.

No. 59.   Argued January 7–8, 1958.—Decided March 10, 1958.

*M. L. Countryman, Jr.* argued the cause for appellants. With him on the brief was *Dean H. Eastman.*

*Daniel M. Friedman* argued the cause for the United States. With him on the brief were *Solicitor General Rankin, Assistant Attorney General Hansen, Henry Geller, Margaret H. Brass* and *W. Louise Florencourt.*

MR. JUSTICE BLACK delivered the opinion of the Court.

In 1864 and 1870 Congress granted the predecessor of the Northern Pacific Railway Company approximately forty million acres of land in several Northwestern States and Territories to facilitate its construction of a railroad

line from Lake Superior to Puget Sound.[1] In general terms, this grant consisted of every alternate section of land in a belt 20 miles wide on each side of the track through States and 40 miles wide through Territories. The granted lands were of various kinds; some contained great stands of timber, some iron ore or other valuable mineral deposits, some oil or natural gas, while still other sections were useful for agriculture, grazing or industrial purposes. By 1949 the Railroad had sold about 37,000,000 acres of its holdings, but had reserved mineral rights in 6,500,000 of those acres. Most of the unsold land was leased for one purpose or another. In a large number of its sales contracts and most of its lease agreements the Railroad had inserted "preferential routing" clauses which compelled the grantee or lessee to ship over its lines all commodities produced or manufactured on the land, provided that its rates (and in some instances its service) were equal to those of competing carriers.[2] Since many of the goods produced on the lands subject to these "preferential routing" provisions are shipped from one State to another the actual and potential amount of interstate commerce affected is substantial. Alternative means of transportation exist for a large portion of these shipments including the facilities of two other major railroad systems.

In 1949 the Government filed suit under § 4 of the Sherman Act seeking a declaration that the defendant's "preferential routing" agreements were unlawful as

---

[1] 13 Stat. 365, 16 Stat. 378. The details of these statutory grants are extensively set forth and discussed in *United States* v. *Northern Pacific R. Co.*, 256 U. S. 51, and *United States* v. *Northern Pacific R. Co.*, 311 U. S. 317.

[2] The volume and nature of these restrictive provisions are set forth in more detail hereafter. See note 6, *infra.*

unreasonable restraints of trade under § 1 of that Act.[3] After various pretrial proceedings the Government moved for summary judgment contending that on the undisputed facts it was entitled, as a matter of law, to the relief demanded. The district judge made numerous findings, as set forth in substance in the preceding paragraph, based on the voluminous pleadings, stipulations, depositions and answers to interrogatories filed in the case, and then granted the Government's motion (with an exception not relevant here). 142 F. Supp. 679. He issued an order enjoining the defendant from enforcing the existing "preferential routing" clauses or from entering into any future agreements containing them. The defendant took a direct appeal to this Court under § 2 of the Expediting Act of 1903, 32 Stat. 823, as amended, 15 U. S. C. § 29, and we noted probable jurisdiction. 352 U. S. 980.

The Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade. It rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions. But even were that premise open to question, the policy unequivocally laid down by the Act is competition. And to this end it prohibits "Every contract, combination . . . or

---

[3] 26 Stat. 209, as amended, 15 U. S. C. §§ 1, 4. Actually there are two defendants here, the Northern Pacific Railway Company and its wholly owned subsidiary Northwestern Improvement Company which sells, leases and manages the Railroad's lands. For convenience and since Northwestern is completely controlled by the Railroad we shall speak of the two of them as a single "defendant" or as the "Railroad."

conspiracy, in restraint of trade or commerce among the several States." Although this prohibition is literally all-encompassing, the courts have construed it as precluding only those contracts or combinations which "unreasonably" restrain competition. *Standard Oil Co. of New Jersey* v. *United States,* 221 U. S. 1; *Chicago Board of Trade* v. *United States,* 246 U. S. 231.

However, there are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are proscribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken. Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, *United States* v. *Socony-Vacuum Oil Co.,* 310 U. S. 150, 210; division of markets, *United States* v. *Addyston Pipe & Steel Co.,* 85 F. 271, aff'd, 175 U. S. 211; group boycotts, *Fashion Originators' Guild* v. *Federal Trade Comm'n,* 312 U. S. 457; and tying arrangements, *International Salt Co.* v. *United States,* 332 U. S. 392.

For our purposes a tying arrangement may be defined as an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not

6

purchase that product from any other supplier.[4] Where such conditions are successfully exacted competition on the merits with respect to the tied product is inevitably curbed. Indeed "tying agreements serve hardly any purpose beyond the suppression of competition." *Standard Oil Co. of California* v. *United States,* 337 U. S. 293, 305–306.[5] They deny competitors free access to the market for the tied product, not because the party imposing the tying requirements has a better product or a lower price but because of his power or leverage in another market. At the same time buyers are forced to forego their free choice between competing products. For these reasons "tying agreements fare harshly under the laws forbidding restraints of trade." *Times-Picayune Publishing Co.* v. *United States,* 345 U. S. 594, 606. They are unreasonable in and of themselves whenever a party has sufficient economic power with respect to the tying product to appreciably restrain free competition in the market for the tied product and a "not insubstantial" amount of interstate commerce is affected. *International Salt Co.* v. *United States,* 332 U. S. 392. Cf. *United States* v. *Paramount Pictures,* 334 U. S. 131, 156–159; *United States* v. *Griffith,* 334 U. S. 100. Of course where the seller has no control or dominance over the tying product so that it does not represent an effectual weapon to pressure buyers into taking the tied item any restraint of trade attributable to such tying arrangements would obviously be insignificant at most. As

---

[4] Of course where the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price.

[5] As this Court has previously pointed out such nonanticompetitive purposes as these arrangements have been asserted to possess can be adequately accomplished by other means much less inimical to competition. See, *e. g., International Business Machines Corp.* v. *United States,* 298 U. S. 131; *International Salt Co.* v. *United States,* 332 U. S. 392.

a simple example, if one of a dozen food stores in a community were to refuse to sell flour unless the buyer also took sugar it would hardly tend to restrain competition in sugar if its competitors were ready and able to sell flour by itself.

In this case we believe the district judge was clearly correct in entering summary judgment declaring the defendant's "preferential routing" clauses unlawful restraints of trade. We wholly agree that the undisputed facts established beyond any genuine question that the defendant possessed substantial economic power by virtue of its extensive landholdings which it used as leverage to induce large numbers of purchasers and lessees to give it preference, to the exclusion of its competitors, in carrying goods or produce from the land transferred to them. Nor can there be any real doubt that a "not insubstantial" amount of interstate commerce was and is affected by these restrictive provisions.

As pointed out before, the defendant was initially granted large acreages by Congress in the several Northwestern States through which its lines now run. This land was strategically located in checkerboard fashion amid private holdings and within economic distance of transportation facilities. Not only the testimony of various witnesses but common sense makes it evident that this particular land was often prized by those who purchased or leased it and was frequently essential to their business activities. In disposing of its holdings the defendant entered into contracts of sale or lease covering at least several million acres of land which included "preferential routing" clauses.[6] The very existence of

---

[6] The district judge found (and his findings are not challenged here) that as of 1949 there were (1) over 1,000 grazing leases covering more than 1,000,000 acres of land, (2) at least 72 contracts for the sale of timberland covering 1,244,137 acres, (3) at least 31 timber sale contracts covering 100,585 acres, (4) at least 19 oil and gas

this host of tying arrangements is itself compelling evidence of the defendant's great power, at least where, as here, no other explanation has been offered for the existence of these restraints. The "preferential routing" clauses conferred no benefit on the purchasers or lessees. While they got the land they wanted by yielding their freedom to deal with competing carriers, the defendant makes no claim that it came any cheaper than if the restrictive clauses had been omitted. In fact any such price reduction in return for rail shipments would have quite plainly constituted an unlawful rebate to the shipper.[7] So far as the Railroad was concerned its purpose obviously was to fence out competitors, to stifle competition. While this may have been exceedingly beneficial to its business, it is the very type of thing the Sherman Act condemns. In short, we are convinced that the essential prerequisites for treating the defendant's tying arrangements as unreasonable *"per se"* were conclusively established below and that the defendant has offered to prove nothing there or here which would alter this conclusion.

In our view *International Salt Co.* v. *United States,* 332 U. S. 392, which has been unqualifiedly approved by subsequent decisions, is ample authority for affirming the judgment below. In that case the defendant refused

---

leases covering 135,000 acres, (5) at least 16 iron ore leases covering 5,261 acres, (6) 12 coal leases (acreage not specified), and (7) at least 17 other mineral leases covering 6,810 acres which contained "preferential routing" clauses.

The grazing leases, timber sales contracts, timberland sales contracts and in some instances the mineral land leases obligated the vendee or lessee to ship its products by way of the defendant's lines unless rates of competitors were lower; the oil and gas leases, coal leases and the remainder of the mineral land leases, unless the rates were lower or the service better; the iron ore leases, unless the defendant's rates, service and facilities were equal to those of any competing line.

[7] 49 U. S. C. §§ 2, 6 (7), 41 (3)

to lease its salt-dispensing machines unless the lessee also agreed to purchase all the salt it used in the machines from the defendant. It was established that the defendant had made about 900 leases under such conditions and that in the year in question it had sold about $500,000 worth of salt for use in the leased machines. On that basis we affirmed unanimously a summary judgment finding the defendant guilty of violating § 1 of the Sherman Act. The Court ruled that it was "unreasonable, *per se,* to foreclose competitors from any substantial market" by tying arrangements. As we later analyzed the decision, "it was not established that equivalent machines were unobtainable, it was not indicated what proportion of the business of supplying such machines was controlled by defendant, and it was deemed irrelevant that there was no evidence as to the actual effect of the tying clauses upon competition." *Standard Oil Co. of California* v. *United States,* 337 U. S. 293, 305.

The defendant attempts to evade the force of *International Salt* on the ground that the tying product there was patented while here it is not. But we do not believe this distinction has, or should have, any significance. In arriving at its decision in *International Salt* the Court placed no reliance on the fact that.a patent was involved nor did it give the slightest intimation that the outcome would have been any different if that had not been the case. If anything, the Court held the challenged tying arrangements unlawful *despite* the fact that the tying item was patented, not because of it. "By contracting to close this market for salt against competition, International has engaged in a restraint of trade for which its patents afford no immunity from the antitrust laws." 332 U. S., at 396. Nor have subsequent cases confined the rule of *per se* unreasonableness laid down in *International Salt* to situations involving patents. Cf. *United States* v. *Griffith,* 334 U. S. 100; *United*

*States* v. *Paramount Pictures,* 334 U. S. 131, 156; *Times-Picayune Publishing Co.* v. *United States,* 345 U. S. 594.[8]

The defendant argues that the holding in *International Salt* was limited by the decision in *Times-Picayune Publishing Co.* v. *United States,* 345 U. S. 594. There the Court held that a unit system of advertising in two local newspapers did not violate § 1 of the Sherman Act. On the facts before it the majority found there was no tying problem at all since only one product was involved and that, in any event, the defendant did not possess sufficient economic power in the advertising market to bring its unit rule within the principle of *per se* unreasonableness. But the Court was extremely careful to confine its decision to the narrow record before it. *Id.,* at 627–628. And far from repudiating any of the principles set forth in *International Salt* it vigorously reasserted them by broadly condemning tying arrangements as wholly inconsistent with the fundamental principles of the antitrust laws. In the Court's forceful terms, "Tying arrangements . . . flout the Sherman Act's policy that competition rule the marts of trade. . . . By conditioning his sale of one commodity on the purchase of another, a seller coerces the abdication of buyers' independent judgment as to the 'tied' product's merits and insulates it from the competitive stresses of the open market. But any intrinsic superiority of the 'tied' product would convince

---

[8] Of course it is common knowledge that a patent does not always confer a monopoly over a particular commodity. Often the patent is limited to a unique form or improvement of the product and the economic power resulting from the patent privileges is slight. As a matter of fact the defendant in *International Salt* offered to prove that competitive salt machines were readily available which were satisfactory substitutes for its machines (a fact the Government did not controvert), but the Court regarded such proof as irrelevant.

freely choosing buyers to select it over others, anyway."
*Id.,* at 605.

While there is some language in the *Times-Picayune* opinion which speaks of "monopoly power" or "dominance" over the tying product as a necessary precondition for application of the rule of *per se* unreasonableness to tying arrangements, we do not construe this general language as requiring anything more than sufficient economic power to impose an appreciable restraint on free competition in the tied product (assuming all the time, of course, that a "not insubstantial" amount of interstate commerce is affected). To give it any other construction would be wholly out of accord with the opinion's cogent analysis of the nature and baneful effects of tying arrangements and their incompatibility with the policies underlying the Sherman Act. *Times-Picayune,* of course, must be viewed in context with *International Salt* and our other decisions concerning tying agreements. There is no warrant for treating it as a departure from those cases. Nor did it purport to be any such thing; rather it simply made an effort to restate the governing considerations in this area as set forth in the prior cases. And in so doing it makes clear, as do those cases, that the vice of tying arrangements lies in the use of economic power in one market to restrict competition on the merits in another, regardless of the source from which the power is derived and whether the power takes the form of a monopoly or not.

The defendant contends that its "preferential routing" clauses are subject to so many exceptions and have been administered so leniently that they do not significantly restrain competition. It points out that these clauses permit the vendee or lessee to ship by competing carrier if its rates are lower (or in some instances if its service is better) than the defendant's.[9] Of course if these re-

---

[9] See note 6, *supra.*

strictive provisions are merely harmless sieves with no tendency to restrain competition, as the defendant's argument seems to imply, it is hard to understand why it has expended so much effort in obtaining them in vast numbers and upholding their validity, or how they are of any benefit to anyone, even the defendant. But however that may be, the essential fact remains that these agreements are binding obligations held over the heads of vendees which deny defendant's competitors access to the fenced-off market on the same terms as the defendant. In *International Salt* the defendants similarly argued that their tying arrangements were inoffensive restraints because they allowed lessees to buy salt from other suppliers when they offered a lower price than International. The Court's answer there is equally apt here.

> "[This exception] does, of course, afford a measure of protection to the lessee, but it does not avoid the stifling effect of the agreement on competition. The appellant had at all times a priority on the business at equal prices. A competitor would have to undercut appellant's price to have any hope of capturing the market, while appellant could hold that market by merely meeting competition. We do not think this concession relieves the contract of being a restraint of trade, albeit a less harsh one than would result in the absence of such a provision." 332 U. S., at 397.

All of this is only aggravated, of course, here in the regulated transportation industry where there is frequently no real rate competition at all and such effective competition as actually thrives takes other forms.

*Affirmed.*

MR. JUSTICE CLARK took no part in the consideration or decision of this case.

MR. JUSTICE HARLAN, whom MR. JUSTICE FRANK-FURTER and MR. JUSTICE WHITTAKER join, dissenting.

The Court affirms summary judgment for the Government by concluding that "the essential prerequisites for treating the defendant's tying arrangements as unreasonable *'per se'* were conclusively established below . . . ." In my view, these prerequisites were not established, and this case should be remanded to the District Court for a trial on the issue whether appellants' landholdings gave them that amount of control over the relevant market for land necessary under this Court's past decisions to make the challenged tying clauses violative *per se* of the Sherman Act. Further, in light of the Court's disposition of the case and the nature of the findings made below, I think that the Court's discussion of *International Salt Co.* v. *United States,* 332 U. S. 392, is apt to produce confusion as to what proof is necessary to show *per se* illegality of tying clauses in future Sherman Act cases.

Because the Government necessarily based its complaint on § 1 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 1, rather than on § 3 of the Clayton Act,[1] it was required to show that the challenged tying clauses constituted *unreasonable* restraints of trade, see *Standard Oil Co. of New Jersey* v. *United States,* 221 U. S. 1. As a result, these tying clauses raise legal issues different from those presented by the legislatively defined tying clauses invalidated under the more pointed prohibitions of the Clayton Act. *Times-Picayune Publishing Co.* v. *United States,* 345 U. S. 594, has made it clear beyond dispute that both *proof* of dominance in the market for the tying product *and* a showing that an appreciable volume of business in the tied product is restrained are

---

[1] The tying arrangements proscribed by § 3 of the Clayton Act relate only to "goods, wares, merchandise, machinery, supplies or other commodities . . . ." 38 Stat. 731, 15 U. S. C. § 14.

essential conditions to judicial condemnation of a tying clause as a *per se* violation of the Sherman Act.[2] 345 U. S., at 608–611. These firm requirements derive from an awareness that the vice apt to exist in tying agreements "is the wielding of monopolistic leverage; a seller exploits his dominant position in one market to expand his empire into the next." 345 U. S., at 611. It is not, as the Court intimates at one point in its opinion, that under the Sherman Act the tying clause is illegal *per se;* the *per se* illegality results from its use by virtue of a vendor's dominance over the tying interest to foreclose competitors from a substantial market in the tied interest.

My primary difficulty with the Court's affirmance of the judgment below is that the District Court made no finding that the appellants had a "dominant position" or, as this Court now puts it, "sufficient economic power," in the relevant land market. Such a finding would indicate that those requiring land of the character owned by the appellants would be driven to them for it, thereby putting appellants in a position to foreclose competing carriers, through the medium of tying clauses, from shipping the produce from the lands sold or leased. The District Court seems to have conceived that no more need be shown on this score than that the appellants owned the *particular* tracts of land sold or leased subject to a tying clause. Thus it said:

> "Defendants argue that the first tying element, i. e., market domination over the tying product, is not established because the record does not show the proportion of N. P. [Northern Pacific] lands of various types to the total of the lands of the same types sold and leased in the area of defendants' operations.

[2] The Court there stated that the presence of *either* factor is sufficient for invalidation of a tying clause under the Clayton Act. 345 U. S., at 608–609.

This contention ignores the plain language of the cited decisions ["tying clause" cases in this Court], providing that market dominance of 'the tying commodity' is required. *The tying commodity need only be the particular property or product to which forced purchase of the second commodity is tied; certainly it does not necessarily include all of the similar and competing commodities which may be in the market. . . .*

"The tying commodity in the present case is the land presently or formerly owned by N. P. *Unrestricted fee-simple title to land vests in the owner absolute domination of the market in such land.* By the ownership of the lands and resulting dominance in the market therefor defendants were able to impose the traffic clauses in question on the grantees and lessees of the land." (Italics added.) 142 F. Supp. 679, 684.

In conformity with these views the ultimate findings of the District Court on the issue of "control" were only these:

"37. Defendants, as sellers and as lessors, *by reason of title in fee simple,* have dominance in the lands now owned by them and had dominance in the lands formerly owned at the time of sale of such lands. [Italics added.]

"38. Defendants have used their dominance in the lands sold and leased to require purchasers and lessees to purchase and use Northern Pacific's transportation service, under the conditions stated in finding 10." (Finding 10 relates to the terms of the tying clauses.)

I do not think that these findings as to appellants' *ad hoc* "dominance" over the particular land sold or leased suffice to meet the showing of market control which *Times-Picayune* established as one of the essential pre-

requisites to holding tying clauses illegal *per se* under the Sherman Act. In effect the District Court's view bypassed that requirement and made the validity of these tying clauses depend entirely on the commercial restraint accomplished by them. The District Court should have taken evidence of the relative strength of appellants' landholdings *vis-à-vis* that of others in the appropriate market for land of the types now or formerly possessed by appellants,[3] of the "uniqueness" of appellants' landholdings in terms of quality or use to which they may have been put, and of the extent to which the location of the lands on or near the Northern Pacific's railroad line, or any other circumstances, put the appellants in a strategic position as against other sellers and lessors of land. Short of such an inquiry I do not see how it can be determined whether the appellants occupied such a dominant position in the relevant land market, cf. *United States* v. *E. I. du Pont de Nemours & Co.*, 351 U. S. 377, as to make these tying clauses illegal *per se* under the Sherman Act.

Explanation for the Court's failure to remand with instructions to pursue such an inquiry apparently lies in part in its statement that the "very existence of this host of tying arrangements is itself compelling evidence of the defendant's great power" over the land market. I do not deny that there may be instances where economic coercion by a vendor may be inferred, without any direct showing of market dominance, from the mere existence of the tying arrangements themselves, as where the vendee

---

[3] The findings entered by the District Court make no reference to appellants' percentage ownership of a proper market for land, and indeed the record contains in only one instance statistics bearing on this problem. In the period between 1935 and 1942, it appears that appellants' holdings of merchantable timber in Montana, Idaho, and Washington constituted approximately 5% of the total merchantable timber in those States.

is apt to suffer economic detriment from the tying clause because precluded from purchasing a tied product at better terms or of a better quality elsewhere. But the tying clauses here are not cast in such absolute terms. The record indicates that a large majority of appellants' lands were close to the Northern Pacific lines and thus vendees or lessees of these lands might be expected to utilize Northern Pacific as a matter of course. Further, substantially all the tying clauses, as found by the District Court, contained provisos leaving the vendee or lessee free to ship by other railroads when offered either lower rates *or* lower rates or superior service. In these circumstances it would appear that the inclusion of the tying clauses in contracts or leases might have been largely a matter of indifference to at least many of the purchasers or lessees of appellants' land, and hence that more is needed than the tying clauses themselves to warrant the inference that acceptance of the tying clauses resulted from coercion exercised by appellants through their position in the land market.

Particularly in view of the Court's affirmance of a judgment based on so inadequate a record, I have further difficulty with the opinion in its treatment of *International Salt,* the decision on which the Court principally relies. The Court regards that case as making irrelevant *proof* of market dominance in the tying interest, but it seems to me that *Times-Picayune* has laid to rest all doubt as to the need for clear proof on this issue. In fact that case considered that in *International Salt* the required element of proof was supplied by the patents themselves which "conferred monopolistic, albeit lawful, market control" over the tying product, 345 U. S., at 608, as indeed the Court in *International Salt* itself suggested by prefacing its holding with the statement that "[defendant's] patents confer a limited monopoly of the invention they

reward." 332 U. S., at 395. Still the Court today states that the tying clauses were there struck down *despite* the fact that the tying product was patented. In short, insofar as the Sherman Act is concerned, it appears that *International Salt* simply treated a patent as the equivalent of proof of market control—a view further supported by what was said about *International Salt* in *Standard Oil Co. of California* v. *United States,* 337 U. S. 293, at 304, 307.

The reliance on *International Salt* with the new scope the Court now gives it is puzzling in light of the Court's express recognition that a finding of sufficient economic power over land to restrict competition in freight services is an essential element here. The Court heightens this paradox by its effort to satisfy this requirement with the assertion that "undisputed facts" conclusively established the existence of this power. But in so concluding, it could hardly rely on the market-dominance findings below which, as I have tried to show, rested upon the District Court's evident misconception of *Times-Picayune.*

I do not understand the Court to excuse findings as to control by adopting the Government's argument that this case should be brought within *International Salt* by analogy of the ownership of land to that of a patent, so that the particular tract of land involved in each purchase or lease itself constitutes the relevant market. The record in any event is without support for such a theory. No findings were made below as to the uniqueness of any of appellants' lands either because of their location [4] or

---

[4] Affidavits before the District Court did indicate that certain landholdings of appellants, particularly grazing lands, were in a checkerboard pattern among private holdings, thereby giving appellants a strategic position with respect to these lands since the private landholders often found it necessary to acquire appellants' lands to fill

because of their peculiar qualities enabling production of superior mineral, timber, or agricultural products. Without such an inquiry, I do not see how appellants' supposed dominance of the land market can be based on the theory that their lands were "unique."

Finally, the Court leaves in unsettling doubt the future effect of its statement that the use of the word "dominance" in *Times-Picayune* implies no more of a showing of market dominance than "sufficient economic power to impose an appreciable restraint on free competition in the tied product." As an abstraction one can hardly quarrel with this piece of surgery, for I do not claim that a monopoly in the sense of § 2 of the Sherman Act must be shown over a tying product. As already indicated, I should think that a showing of "sufficient economic power" in cases of this kind could be based upon a variety of factors, such as significant percentage control of the relevant market, desirability of the product to the purchaser, use of tying clauses which would be likely to result in economic detriment to vendees or lessees, and such uniqueness of the tying product as to suggest comparison with a monopoly by patent. But I venture to predict that the language of the Court, taken in conjunction with its approval of the summary disposition of this case, will leave courts and lawyers in confusion as to what the proper standards now are for judging tying clauses under the Sherman Act.

The Court's action in affirming the judgment below sanctions what I deem to be a serious abuse of the summary judgment procedures. Cf. *Sartor* v. *Arkansas Natural Gas Corp.*, 321 U. S. 620. A record barren of facts adequate to support either a finding of economic

---

gaps in existing ranges. The amount of such land does not appear, and I do not think that these affidavits justify short-circuiting an inquiry into the broad issue of market dominance.

power over a relevant land market or a finding that the land involved is so unique as to constitute in itself the relevant market is remedied by this Court's reliance upon "common sense" and judicial notice of appellants' commanding position. But these are poor substitutes for the proof to which the Government should be put. I would remand to the District Court for a trial and findings on the issue of "dominance."