APPLERA CORPORATION and Roche Molecular Systems, Inc., plaintiffs,

v.

MJ RESEARCH INC. and Michael and John Finney, defendants.

No. 3:98 CV 1201(JBA).

United States District Court, D. Connecticut.

March 16, 2004.

Asim Varma, David Gersch, Michael J. Klyce, Jr., Arnold & Porter, Washington, DC, James Sicilian, Jennifer K. Lawson, Day, Berry & Howard, Hartford, CT, Jennifer Gordon, John Josef Molenda, Patrick J. Hoeffner, Robert A. Cote, Sharon Yang, Rita Lynn Berardino, Orrick, Herrington & Sutcliffe, David Greenbaum, Weil, Gotshal & Manges, New York, NY, Edward R. Reines, Paul Ehrlich, Weil, Gotshal & Manges, Redwood Shores, CA, James T. Shearin, Pullman & Comley, Bridgeport, CT, for Plaintiffs.

Albert L. Jacobs, Jr., Gerard F. Diebner, Joseph M. Manak, Greenberg Traurig, Daniel A. Ladow, Graham & James, Christine Cora True–Frost, David A. Hoffman, John E. Beerbower, Cravath, Swaine & Moore, New York, NY, David S. Panzer, C. Allen Foster, Kevin E. Stern, Timothy C. Bass, Greenberg Traurig, LLP, Washington, DC, Joseph B. Darby, III, Greenberg & Traurig, Boston, MA, Donna Nelson Heller, Harold Bolton Finn, III, Meghan A. Laganza, Patrick J. McHugh, Finn Dixon & Herling, Stamford, CT, for Defendants.

**Ruling on Motion in Limine to Preclude Evidence and Argument that Applera Packaged or Tied PCR Process Patent Rights With Thermal Cycler Patent Rights [Doc. # 773(4) ]**

ARTERTON, District Judge.

Plaintiffs Applera Corporation and Roche Molecular Systems, Inc. seek to exclude any evidence or argument by defendants MJ Research Inc. and Michael and John Finney that Applera has unlawfully packaged or tied PCR process patent rights with thermal cycler patent rights. For the reasons discussed below, plaintiffs' motion is denied.

I.  Discussion

MJ's antitrust counterclaim and patent misuse defense are based in part on the allegation that Applera unlawfully tied the rights to its PCR process patents with its thermal cycler patents by coercing suppliers and end users to buy licenses for both sets of patent rights, even if they need or

want only one kind of license. Applera seeks to exclude evidence and argument on this claim, arguing that it is untenable as a matter of law because it is undisputed that Applera offered MJ the rights to the two sets of patents separately. While MJ does not dispute that Applera offered rights to the two sets of patents separately, MJ asserts that (1) the separate offer was valid only for suppliers who purchased licenses for the PCR process patent rights; and (2) even if Applera offered licenses for the two sets of patent rights separately, suppliers including MJ were coerced into purchasing the entire package.

### A. Separate Licenses

It is well established that "[i]f each of the products may be purchased separately in a competitive market, one seller's decision to sell the two in a single package imposes no unreasonable restraint on either market . . . ." *Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 12, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984); *see also Northern Pac. R. Co. v. United States,* 356 U.S. 1, 6 n. 4, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958) ("Of course where the buyer is free to take either product by itself there is no tying problem even though the seller may also offer the two items as a unit at a single price.").

Applera provides substantial support for its contention that it offered separate licensing arrangements for its process patents and its thermal cycler patents. First, it is undisputed that Applera offered MJ separate rights to the PCR process patents and thermal cycler patents under both the Supplier Authorization Program (SAP) and End User Authorization Program (EAP). In a letter dated December 22, 1994, for example, Applera stated:

> As we discussed during our meeting, rights for either the authorization under the PCR process patents or the license under the instrument patents are available separately to thermal cycler suppliers. The financial terms to thermal cycler suppliers for an agreement granting only authorization rights under the PCR process patents are $30,000 issuance fee and per instrument fee, based on the capacity of the thermal cycler, as follows: $400 for a capacity of up to 96 samples plus $25 for each additional 96 samples or part thereof. The financial terms to thermal cycler suppliers for an agreement granting only rights under the instrument patents are $90,000 issuance fee and 9% Net Sales Price. . . . [Applera] makes the above rights available to end users. As you requested, I am enclosing current copies of [Applera's] three types of end user thermal cycler agreements: authorization rights under the PCR process patents and license under the PCR instrument patents, authorization rights under the PCR process patents only, and license under the PCR instrument patents only.

Letter of Hanna Fischer to John and Michael Finney, Dec. 22, 1994 [Doc. # 788, Ex. 10] at PE 011991–2.[1]

In fact, MJ received from Applera end user authorization licenses to the PCR

---

1. *See also* Letter of Hanna Fischer to John and Michael Finney, August 1, 1995 [Doc. # 788, Ex. 10] at PE 016163 ("As we have told you, we are now offering combined rights at a substantial savings over the same rights purchased separately. Nonetheless, the rights are assuredly available separately."); Letter of Hanna Fischer to Michael Finney, April 2, 1996 [Doc. # 788, Ex. 10] at PE 011815 ("I have prepared a Thermal Cycler Authorization Agreement that covers only the upfront fee component of a license for the PCR process ('authorization'), as you requested in your telephone call. This agreement *does not include a license under the apparatus patents that we have discussed before.* Since you have received copies of the three types of 'end user' agreements that [Applera] has available and have discussed the agreements with us on several occasion, you are

process patents without obtaining rights to the thermal cycler patents.[2] Applera has also submitted copies of every Supplier Authorization Program (SAP) agreement that it reached with the various thermal cycler suppliers on the market, each, with one exception, stating that Applera offered the supplier the patent rights separately.[3] In five of these agreements, the suppliers chose to accept only the process patent

aware that the authorization rights under the PCR process and a license under the apparatus patents are available separately or in combination (and that [Applera] is able to offer the rights at substantial savings in a combined agreement). As you know, it is [Applera's] position that for MJ Research thermal cyclers you need apparatus rights as well. In sending you the Thermal Cycler Authorization Agreement you requested, I remind you that apparatus rights are available separately and that, should you execute a license agreement for apparatus rights at a future date for these instruments, the license agreement would be at the rate for apparatus rights only.").

**2.** *See* Thermal Cycler Authorization Agreement between Applera and MJ [Doc. # 788, Ex. 11] at PE 020813 ("Whereas, [Applera] offers the above process rights and apparatus rights separately or in combination, and, PCR User has requested PCR process license rights only, without rights under any apparatus claims.").

**3.** *See* Thermal Cycler Authorization Agreement between Applera and Cold Spring Harbor Laboratory, Feb. 26, 1997 [Doc. # 788, Ex. 12] at PE 017539 ("Whereas, [Applera] offers the above process rights and apparatus rights separately or in combination, and Thermal Cycler Supplier has requested PCR process license rights only, without rights under any apparatus claim."); Thermal Cycler Supplier Authorization Agreement between Applera and GeneSystems, Sept. 1, 2002 [Doc. # 788, Ex. 13] at PE 108246 ("Whereas, ABI has offered to Thermal Cycler Supplier the above Roche process rights, and the ABI systems, apparatus, automated method and pressing heated cover rights separately or in combinations, and Thermal Cycler Supplier has requested only under the above Roche process patents, without rights under the above identified ABI patents and applications."); Thermal Cycler Supplier Authorization Agreement between Applera and Kaybee Engineering Ltd., Oct. 8, 1999 [Doc. # 788, Ex. 14] at PE 082979 (Kaybee received only process patent rights); Thermal Cycler Supplier Authorization Agreement between Appl-

era and Stratagene, Jan. 1, 1995 [Doc. # 788, Ex. 15] at 022309 (Stratagene received only process patent rights); Thermal Cycler Supplier Agreement between Applera and Cephoid, Apr. 15, 2000 [Doc. # 788, Ex. 18] at PE 105093 (Cephoid received only process patent rights); Thermal Cycler Supplier Authorization Agreement between Applera and Appligene Oncor, signed Feb. 26 and Mar. 8, 1998 [Doc. # 788, Ex. 16] at PE 016597 (stating that Applera offered separate process and thermal cycler rights and Appligene requested those rights in combination); Thermal Cycler Supplier Agreement between Applera and Bio–Rad Laboratories, Inc., Apr. 1, 1998 [Doc. # 788, Ex. 17] at PE 017024 (same); Thermal Cycler Supplier Agreement between Applera and Eppendrof–Netheler–Hinz GmbH, June 1, 1997 [Doc. # 788, Ex. 19] at PE 017945 (same); Thermal Cycler Supplier Agreement between Applera and Life Sciences International Plc, Dec. 27, 1996 [Doc. # 788, Ex. 20] at PE 19160 (same); Thermal Cycler Supplier Agreement between Applera and Microcosm, Inc., October 16, 2002 [Doc. # 788, Ex. 21] at PE108222 (same); Thermal Cycler Supplier Agreement between Applera and MWG Biotech AG, Aug. 1, 1999 [Doc. # 788, Ex. 22] at PE 083095 (same); Thermal Cycler Supplier Agreement between Applera and Sanyo Electric Co., Ltd., June 1, 1995 [Doc. # 788, Ex. 23] at PE 021637 (same); Thermal Cycler Agreement between Applera and Scinics Corp., Nov. 1, 1999 [Doc. # 788, Ex. 24] at PE 086316 (same); Thermal Cycler Supplier Agreement between Applera and Smiths Detection, June 15, 2003 [Doc. # 788, Ex. 25] at PE 109222 ("Whereas, ABI has offered to Thermal Cycler Supplier the above Roche process rights, and the Perkin–Elmer systems, apparatus, automated method and pressing heated cover rights separately or in combinations, and Thermal Cycler Supplier has requested rights under the above Roche PCR process patents and ABI systems patent rights and automated method patent rights only, without rights under the above identified ABI apparatus and pressing heated cover patents and applications.").

In the one SAP agreement in which the thermal cycler patent rights were not provided for

rights, without also taking the instrument patent rights. Applera also presented evidence that before the implementation of its Supplier Authorization Program, it granted Kodak thermal cycler rights only,[4] and offered another thermal cycler supplier terms for a license for instrument patent rights only license, without requiring licensing of the PCR process patents.[5] Moreover, Applera has entered into 20 end user authorization agreements with 11 companies, granting PCR process rights separately from the instrument patent rights. *See* Thermal Cycler Authorization Agreements [Doc. # 788, Ex. 31]. Applera's internal policy from February 7, 1994 provided that Applera "would be prepared to discuss terms for only the authorization [i.e. process patents] or the license [i.e. instrument patents]." *See* Thermal Cycler Licensing Program Status Update, Feb. 7, 1994 [Doc. # 788, Ex. 28] at PE 110559–10. The terms set forth in the policy statement were the following:

| | |
|---|---|
| Authorization + License: | $100,000 upfront issuance fee + per instrument $300 + 7% net revenues |
| Authorization only: | $30,000 upfront issuance fee + $400/instrument + $25/96 wells for instruments with >96 wells |
| License only: | $90,000 upfront issuance fee + 7% net revenues. |

The memo noted, however, that "[Applera] will discuss Authorization-only and License-only terms only when brought up by Supplier." *See* Thermal Cycler Licensing Program Status Update, Feb. 7, 1994 [Doc. # 788, Ex. 28] at PE 110559–10. Applera's "script" for responding to licenses inquiries also instructed that the suppliers be informed that the "patent rights are available separately, but [Applera] supplies them in a combined agreement at some financial savings." *See* PCR Licensing Script, updated 6/23/98 [Doc. # 788, Ex. 29] at PE 016233. Applera's letters to suppliers in the course of negotiating licensing agreements also specify that the patent rights are available separately. *See* [Doc. # 788, Ex. 30].

While MJ does not dispute this evidence, it challenges its implication. In particular, MJ contends that while *process* patent rights may have been available separately if suppliers like MJ did not wish to purchase licenses for the *thermal cycler* patents, Applera de facto refused to license its thermal cycler patent rights to "unauthorized" suppliers like MJ who refused to purchase process patent licenses.[6]

## B. Coercion

Mandatory package licensing may be found if MJ was not provided with a realis-

___

separately, the instrument patents applications were still pending, and had not yet been issued. *See* Thermal Cycler Supplier Agreement between Applera and Takara, April 25, 1994 [Doc. # 788, Ex. 26] at PE 022732.

4. *See* Agreement, June 3, 1993 [Doc. # 788, Ex. 27]. The Agreement between Kodak and Applera was signed in 1993, prior to the implementation of the Supplier Authorization Program, when Applera first began licensing its process patents to suppliers. The agreement with Kodak thus makes no mention of the existence of the process patents, or the need to obtain licenses to perform PCR on thermal cyclers under the process patents.

5. *See* Letter from Hanna Fischer to S. Constantine, Jan. 19, 1996 [Doc. # 788, Ex. 32] at

2 ("A worldwide license under only the apparatus rights has financial terms of 9% NSP (thermal cyclers and satellite modules), license issue fee of $90,000, and back royalties calculated at 100%.).

6. MJ argues that Applera refused to offer separate licenses for the thermal cycler patents to other thermal cycler suppliers if Applera believed the supplier needed rights to both the process and thermal cycler patents. For example, Applera responded to the supplier Bio–Rad's inquiry as to separate pricing as follows:

[A]lthough I will gladly provide you with the current per-thermal cycler terms for authorization rights under the PCR process

tic choice. The pricing scheme for the separate licenses must not be structured to compel purchase of the package, i.e. structured so that no reasonable buyer would purchase the rights separately. *See* Areeda, Elhauge & Hovenkamp, X *Antitrust Law* ¶ 1758b (1996) at 343. The threshold question, then, is "whether the discount has an effect similar to an outright refusal to sell tying product A separately." *Id.* at 341. As the Second Circuit stated in *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 192 (2d Cir.1992), the buyer "must allege facts sufficient to support an inference that [the seller] has 'appreciable economic power' in the tying product, and affected a substantial amount of commerce. In other words, a reasonable trier of fact must be able to find 'actual coercion by the seller that in fact force[d] the buyer to purchase the tied product....' " Such coercion "should be presumed when the defendant's separate price for either product equals or exceeds the package price." Hovenkamp, at § 1758.

MJ argues that a mandatory package licensing scheme was *de facto* present because the financial terms of the separate licenses were unreasonable, and coerced prospective licensees into purchasing the entire package of patent rights even though they did not want or need them. The record shows that MJ was offered two different pricing lists. The first, in 1994, priced the thermal cycler licenses less than the combined set of patent rights. MJ points to the second offer, made in 1996, which it interprets to price licenses for a complete set of instrument patent rights at a rate higher than the package for both instrument and process patent rights. Applera's proposal from February 9, 1996 provided the following terms:

| Patent Rights | Issuance Fee | Per Thermal Cycler Fees |
|---|---|---|
| Amplification Patent Rights + PCR Instrument Patents ('852, '675) + '610 patent | $120,000 | $300 + 9% Net Sales Price |
| Amplification Patent Rights + PCR Instrument Patents ('852, '675) | $100,000 | $300 + 7% Net Sales Price |
| Amplification Patent Rights only | $ 30,000 | $400 for capacity to 96 samples plus $25 for each additional 96 sample capacity |
| PCR Instrument Patents ('852, '675) only | $ 90,000 | 9% Net Sales Price |
| '610 patent only | $ 75,000 | 5% Net Sales Price |

patents only or license rights under the apparatus patents only, I believe this can be handled contractually at the time it becomes necessary. [Applera]'s position will be that for thermal cyclers which we agree do not need a license under the identified apparatus patent rights, the per-thermal cycler authorization rate for the process rights will be the rate [Applera] is charging for those rights only. Similarly, for thermal cyclers which Perkin–Elmer agrees do not need an authorization under the process rights, the per thermal cycler rates for a license under the apparatus patents will be the rate Perkin–Elmer is then charging for those rights only. Letter of Hanna Fischer to Sanford Wadler, BIO–RAD Laboratories, Sept. 12, 1996 [Doc. # 470, Ex. 69].

MJ acknowledges, however, that MJ itself was offered a choice of unbundled rights, at least formally. MJ claims no injury or threatened injury to itself resulting from Applera's actions toward other suppliers.

*See* Summary of Financial Terms Presented to MJ Research Inc., Feb. 9, 1996 [Doc. # 470, Ex. 67].

MJ interprets this summary to mean that if it wished to purchase the full set of instrument patent rights ('852, '675, '610), but not the process patent rights, it would be required to pay $90,000 + $75,000 upfront, or $165,000, and 9% + 5% of the Net Sales Price, or 14%, which is considerably more expensive than the license cost for the package of instrument and process patent rights.

In response, Applera argues first that MJ has posited a false result, because a "supplier is unlikely to license only the thermal cycler patents because the PCR process patents and thermal cycler patents are blocking patents." *See* Memorandum in Support of Plaintiffs' Motion in Limine to Preclude Evidence and Agrument that Applera Packaged or Tied PCR Process Patent Rights with Thermal Cycler Patent Rights [Doc. # 774, Ex. 4] at 3 n. 3. "By definition, blocking patents disclose interdependent parts of the same product." *International Mfg. Co. v. Landon, Inc.*, 336 F.2d 723, 730 (9th Cir.1964). Thus, "[a] license package containing blocking patents may be considered a single distinct product," and would not present an unlawful tie. *Id.* Applera does not explain how its claim that the thermal cycler patents are "blocking patents" because they cover thermal cyclers used for PCR is consistent with this Court's claim construction. *See* Claim Construction of Disputed Terms in U.S. Patents 5,333,675, 5,656,493, and 5,473,610 [Doc. # 715] at 3 (construing '675 patent as follows: "The preamble is not limiting because it describes a use of an invention and because the body of the claim defines a structurally complete invention capable of PCR such that a deletion of the preamble would not affect that

structure. Even if the preamble were construed as a limitation of the claim, the language 'capable of' does not require that the apparatus must actually be used to perform PCR.") (citation omitted); *see also id.* at 26 (construing '610 patent similarly). Of the thermal cycler patents in dispute, only the '493 patent has been construed to cover thermal cyclers used for PCR and for nothing else (as the patent requires the presence of reagents).

Applera conclusorily argues that MJ's interpretation of its pricing list to require the payment of two upfront fees and two "per cycler" fees is incorrect, but offers no supporting evidence. The price list is ambiguous. It nowhere states what the price for the full set of thermal cycler patent rights would be, and, even more importantly, nowhere makes available the full set of thermal cycler patent rights, separately from the process patent rights. Viewed in the light most favorable to MJ, there is clearly a factual dispute which, if resolved in MJ's favor, may suffice for a jury's finding of coercion. Applera's evidence that other thermal cycler suppliers bought process patent rights separately from the thermal cycler patent rights cannot create a presumption that, in the inverse, the purchase of thermal cycler patent rights without the process patent rights was economically viable. Because issues of material fact about the actual terms of Applera's pricing program remain in dispute, a trial determination is necessary.

## II. Conclusion

For the foregoing reasons, plaintiffs' Motion in Limine to Preclude Evidence and Argument that Applera Packaged or Tied PCR Process Patent Rights With

Thermal Cycler Patent Rights [Doc. # 773(4) ] is DENIED.

IT IS SO ORDERED.