**Dean O. WEBB, Regency Consultants, Inc., and Primo's Partners, Ltd.**

**v.**

**PRIMO'S INC., Ferris Anthony and Carmelo Tringali.**

**Civ. No. 1:88–cv–888–ODE.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Oct. 11, 1988.

Edward W. Klein, III, Office of Edward W. Klein, Thomas Charles Sinowski, Sandy E. Scott, Sinowski & Jones, Marietta, Ga., for plaintiffs.

Dan Bessent Wingate, Long, Weinberg, Ansley & Wheeler, Atlanta, Ga., Charles Edward Gallagher, Primo's Inc., Fayetteville, Ga., for defendants.

## ORDER

ORINDA D. EVANS, District Judge.

This action is before the court on various motions by both Defendants Primo's Inc., Ferris Anthony, and Carmelo Tringali ("Defendants") and Plaintiffs Dean O. Webb, Regency Consultants, Inc., and Primo's Partners, Ltd. ("Plaintiffs"). In their complaint Plaintiffs allege violations of the Sherman Act, 15 U.S.C. § 1, the Clayton Act, 15 U.S.C. § 14, the Racketeer Influenced and Corporate Organizations Act (RICO), 18 U.S.C. § 1962(c) and various state law claims. Plaintiffs move to amend their complaint and move to strike Defendants' counterclaim and to compel discovery. Defendants assert motions to dismiss, for summary judgment, for a protective order, for a discovery conference, for production of documents and to strike Plaintiff's first amended complaint.

This case arose after Plaintiff Dean O. Webb met with Defendants Anthony and Tringali, the officers and sole shareholders of Defendant Primo's Inc., in the summer of 1987 about purchasing a number of Primo's franchised "pizza and sub" fast food restaurants. On September 25, 1987 Plaintiff submitted an initial offer to buy five franchised stores. After further negotiations, Plaintiff executed three franchise agreements on October 30, 1987 covering restaurants in Stone Mountain, Lake City and Stockbridge, Georgia.[1]

These franchise agreements set out in great detail the relationship between the parties. The franchisees were expected to furnish and run the restaurants according to Defendants' specifications, to participate in Defendants' training program and sell only products approved by Defendants. The agreement allowed the franchisee to purchase products from any approved supplier and to submit other products to the franchisor for approval. Defendants, as the franchisors, promised to assist in store openings and operations, provide copies of an operations manual and to periodically inspect the premises. The agreements allowed the franchisee to unilaterally terminate the relationship on a material breach by the franchisor.

Plaintiff Webb, who was president of an investment firm and had no experience in the fast food business, incorporated Plaintiff Regency Consultants, Inc. in September, 1987, to act as the managing company of the franchised stores and formed Plaintiff Primo's Partners, Ltd., to operate as the owners. The latter was to be funded by investors after a syndication.

The franchises were unprofitable and in late 1987 the relationship between the parties began to deteriorate. As a result, on April 15, 1988 Plaintiff, through his attorneys, announced his termination of the franchise agreements on the grounds that Defendants had made false representations in the sale of the franchises and failed to make disclosures required by Georgia law before entering into a business opportunity contract.

Plaintiffs claim that Defendants conspired to cause the franchises to fail. Defendants' refusal to assist in the store openings, to train Plaintiff's employees, to provide operations manuals and to inspect their restaurants as promised in the franchise agreements are among the factors Plaintiffs blame for the failure. In addition, Plaintiffs contend that Defendants forced them to purchase products from Defendants' commissary at unfairly high prices and misrepresented the operational costs.

On April 22, 1988 Plaintiffs filed the instant law suit. The complaint is cast in seven counts alleging (1) tying and unfair competition in violation of the Sherman Act, 15 U.S.C. § 1, the Clayton Act, 15 U.S.C. § 14, and the Federal Trade Commission Act (FTC Act), 15 U.S.C. § 45; (2) wire and mail fraud in violation of RICO, 18 U.S.C. § 1961(1)(B); (3) fraud and deceit in violation of O.C.G.A. § 51–6–1; (4) unfair trade practices; (5) violation of the Georgia Fair Business Practices Act, O.C.G.A. § 10–1–393(b)(5) and 393(b)(9); violation of the Georgia Sale of Business Opportunities Act, O.C.G.A. §§ 10–1–411 and 413; and (7) breach of contract.

---

**1.** Plaintiff Webb also acquired an option to buy several other Primo's franchises.

On June 14, 1988, Plaintiffs moved to amend to their complaint adding an eighth count alleging Rule 11 violations and the tort of abusive litigation in response to Defendants' counterclaims. Plaintiffs again moved to amend the complaint on July 25, 1988, apparently to set out the allegations of fraud with greater particularity. These motions are GRANTED and will be considered in ruling on the motions before the court.

### The FTC Act and Antitrust Claims

The court now turns to Defendants' motions to dismiss and for summary judgment. Defendants contend that because Plaintiffs' federal law claims are without merit, this court lacks jurisdiction to hear the state law claims due to the absence of diversity of citizenship.

■ As to Count I, Defendants correctly maintain that there is no private cause of action under the FTC Act, 15 U.S.C. § 45. *See Fulton v. Hecht,* 580 F.2d 1243, 1249 n. 2 (5th Cir.1978), *cert. denied,* 440 U.S. 981, 99 S.Ct. 1789, 60 L.Ed.2d 241 (1979). Plaintiffs' claims under the Sherman and Clayton Acts basically allege that Defendants engaged in illegal tying[2] and contracted, combined and conspired with "an unknown co-conspirator (a potential purchaser of the franchises)" in restraint of trade to prevent Plaintiffs from competing fairly in the fast food market in Atlanta. The Clayton Act claim involves allegations that Defendants tied the sale of food inventory at inflated prices to the sale of franchises in restraint of free competition.

With regard to the antitrust violations under the Sherman Act, Defendants Anthony and Tringali maintain that because they are both officers of Defendant Primo's Inc., the allegations lack the plurality of actors necessary to support a claim under section 1,[3] which only "reaches unreasonable restrains of trade effected by a 'contract, combination ... or conspiracy' between *separate* entities." *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 768, 104 S.Ct. 2731, 2740, 81 L.Ed. 2d 628 (1984) (emphasis in the original). The allegations of "an unknown co-conspirator" do not cure this deficiency, according to Defendants, because their affidavits denying concerted action pierce Plaintiffs' pleadings. Defendants also assert that the Plaintiff cannot make out a prima facie case of illegal tying. In addition, Defendants contend that Plaintiffs are bound by the franchise agreements they attached to the complaint, which explicitly allow franchisees to purchase products from approved sources other than Defendants.

Plaintiffs do not argue that the franchise agreements themselves create an illegal tying agreement. They instead attempt to establish illegal tying through Defendants' alleged statements and conduct.

■ Section 1 of the Sherman Act only reaches concerted conduct. *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 769, 104 S.Ct. 2731, 2740–41, 81 L.Ed.2d 628 (1984). Contracts, combinations or conspiracies between officers in the same firm do not raise the antitrust concerns that section 1 was designed to address. *Id.* Plaintiffs' bare allegations of an "unknown co-conspirator" are insufficient to counter Defendants affidavits denying a conspiracy and will not survive summary judgment or to bring this claim within section 1.

■ As to Plaintiffs' allegations of tying, the "essential characteristic" of an illegal tying arrangement is the seller's ex-

---

**2.** A tying arrangement is "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product." *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

**3.** Section 1 of the Sherman Act states that:
"Every contract, combination in the form of a trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is de-
clared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or, if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court."

ploitation of its control over the tying product (in this case the franchise) to force the buyer into the purchase of the tied product (here the goods sold by Defendants' commissary) "that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms." *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 12, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984). "The key to such an arrangement's anticompetitiveness (and thus its illegality) is the seller's ability to *force* buyers to purchase one product in the package, the tied product, by virtue of the seller's control or dominance over the other product in the package, the tying product." *Tic–X–Press v. Omni Promotions Co. of Georgia*, 815 F.2d 1407, 1414 (11th Cir. 1987) (emphasis in the original).

■ The franchise agreements Plaintiff Webb signed did not require that all products used at the stores be purchased from Defendants.[4] Therefore, the agreements themselves did not create a tying arrangement that was illegal per se. *Kentucky Fried Chicken v. Diversified Packaging Corp.*, 549 F.2d 368, 379 (5th Cir. 1977); *see Siegel v. Chicken Delight, Inc.*, 448 F.2d 43 (9th Cir.1971). However, a tie need not be written to be illegal. *Kentucky Fried*, at 377.

■ As to whether Defendants' actual business practices created an illegal tying arrangement, Plaintiff must prove five elements to establish a prima facie case under a "rule of reason" analysis: (1) a tying and a tied product; (2) evidence of actual coercion by the seller that in fact forced the buyer to purchase the tied product; (3) evidence that the seller had sufficient market power with regard to the tying product to force the purchaser to buy the tied product; (4) anticompetitive effects in the tied market; and (5) a "not insubstantial amount" of interstate commerce involvement in the tied market. *Amey, Inc. v. Gulf Abstract & Title, Inc.*, 758 F.2d 1486, 1503 (11th Cir.1985), *cert. denied*, 475 U.S. 1107, 106 S.Ct. 1513, 89 L.Ed.2d 912 (1986).

■ Proof of coercion would make the tying arrangement illegal per se and eliminate the necessity of establishing the actual anticompetitive effects in the tied market. *Jefferson Parish*, 466 U.S. at 15–16, 104 S.Ct. at 1560. However, to justify per se condemnation, there must be a substantial potential for impact on competition. *Id.* at 16, 104 S.Ct. at 1560.

Regarding the first element, the existence of a tying and a tied product, Plaintiffs allege that Defendants conditioned the sale of franchises on the sale of commissary goods. As noted, this arrangement need not be set out in writing.

■ As to the second element, coercion, Plaintiffs allege a "pattern of threats and other coercive behavior [which] forced franchisees to purchase goods from [Defendants'] commissary at higher prices that [sic] could be obtained through other providers." As evidence of that assertion, Plaintiff Webb's affidavit stated that during the negotiations and closing he had the impression that buying goods from Defendant's commissary was required. He also claimed that he was unable to find a supplier who sold items meeting Defendants' quality specifications.[5] In addition, he recounted an incident where Defendants found a package of Hormel Lasagna on his premises and refused to deliver goods Plaintiffs had ordered until Plaintiff's attorney "got involved." An affidavit by Jerry Robinson, manager of Plaintiff Webb's

---

**4.** The agreement in pertinent part stated that: "the Franchisor may in its sole discretion require that ingredients, supplies, and materials used in the preparation, packaging, and delivery of pizza, food, and beverages be purchased exclusively from approved suppliers. Any ingredient, supply or material not theretofore approved by the Franchisor as conforming to its specifications and quality standards must be submitted for examination and/or testing by the Franchisor prior to use in the Primo's store. Franchisee may purchase from any source ingredients, supplies, and materials used in the preparation, packaging and delivery of pizza, food and beverage items which the Franchisor has approved as conforming to its specifications and quality standards ..."

**5.** Plaintiff Webb also indicated that he felt Defendants' own products did not meet their specifications.

stores, stated that "Plaintiff had heard from other franchisees about the violent temper, cursing and threats made by Defendant Anthony regarding the purchase of food from other sources."

The court finds this evidence insufficient to establish that Defendants required Plaintiffs to buy only commissary products. Proof of coercion "requires evidence of actual exertion of economic muscle against the buyer which actually influences his choice of products in the market." *Tic–X–Press*, 815 F.2d at 1415. The element of coercion is a question of fact and even in antitrust cases, at the summary judgment stage an analysis of the facts is appropriate, especially when, as here, motive and intent are not determinative. *Robert's Waikiki U–Drive, Inc. v. Budget Rent–A–Car Systems*, 732 F.2d 1403, 1406 (9th Cir.1984).

Plaintiff Webb's claim that prior to signing the franchise agreements Defendants led him to believe that he was required to purchase all products from them is not sufficient to establish coercion, because his prior impressions were merged into the agreement he signed. Furthermore, as a sophisticated businessman and president of his own investment corporation who engaged in lengthy negotiations prior to making this purchase, it must be presumed that he was aware of the contents of these contracts.

Plaintiff's inability to locate an alternative supplier who sold items meeting Defendants' quality specifications does not establish coercion, especially in the face of Defendants' evidence that Plaintiffs did not submit any suggestions of alternative suppliers or products for Defendants' approval and that other franchisees buy items from other sources. *See Kentucky Fried*, 549 F.2d at 377 n. 9 (coercion to purchase from approved sources does not establish a tie). While there is no requirement that Plaintiff must attempt to purchase the tied product elsewhere, there must be some proof that Plaintiff was foreclosed from shopping around. *Tic–X–Press*, 815 F.2d at 1415 n. 15. As there is no evidence that Defendants withheld approval of any product or

supplier submitted and the agreements themselves did not prevent Plaintiff from shopping elsewhere (provided the alternative goods were submitted for approval) Plaintiffs' inability to find an alternative supplier, without more, does not establish coercion.

Likewise, Plaintiffs' recounting of the Hormel Lasagna incident does not prove coercion. The franchise agreements specifically prohibited the "use" of alternative ingredients not first submitted to Defendants for approval. Even if, as Plaintiff claims, the lasagna was only on the premises for testing and not for sale, this episode does not establish that Plaintiff was precluded from buying the goods elsewhere or that the sale of franchises was conditioned on buying Defendants' commissary goods. *See Tic–X–Press* at 1418.

The evidence in Jerry Robinson's affidavit that Defendant Anthony exercised a violent temper regarding the purchase of food from other sources is hearsay. Plaintiffs offer no evidence that this behavior was ever directed at them or occurred in their presence. Allegations in a letter by Plaintiff Webb that Defendant Anthony directed profanity at Jerry Robinson are not substantiated by Mr. Robinson's affidavit.

But even if Defendants did flex their economic muscles to an extent that affected Plaintiffs' choice of products in the marketplace, Plaintiffs have presented no evidence of the final three elements necessary to prove an illegal tying arrangement. Instead, Plaintiffs apparently maintain that merely the existence of a unique franchise trade or service mark in combination with a "potential" to impose a tie-in is sufficient to make the arrangement illegal per se. This circuit certainly has never adopted that theory. *Midwestern Waffles, Inc. v. Waffle House, Inc.*, 734 F.2d 705, 712 (11th Cir.1984). Moreover, Plaintiffs' reliance on *Siegel v. Chicken Delight, Inc.*, for this proposition is misplaced. In that case the franchise agreement itself established a tie-in by requiring owners to buy certain items as a condition of obtaining a franchise. *Id.*, 448 F.2d 43 (9th Cir.1971). The court ruled that the combination of the unique

Chicken Delight trademark and its *demonstrated* power to impose a tie-in brought the case within the per se rule of the Sherman act. *Id.* at 49. That case does not address potentialities.

Plaintiffs apparently place all their eggs in the per se basket. They have not argued that Defendants injured competition in the tied market, as is required under the rule of reason analysis. *Jefferson Parish,* 466 U.S. at 16, 104 S.Ct. at 1560. It is well settled that "[i]njury to the antitrust plaintiff alone is insufficient to prove injury to competition." *Robert's Waikiki U–Drive,* 732 F.2d at 1048. However, the court has searched the record for evidence of the remaining elements in a prima facie case under the rule of reason analysis to assure that Plaintiff is not precluded from presenting this claim.

■ The third element Plaintiffs must prove ties the use of coercion to Defendants' market power. Plaintiffs contend that Defendants' supplies were overpriced or of low quality.

However, these bare assertions do not counter Defendants denial that they have the kind of economic power necessary to force buyers of pizza and sub stores to purchase their commissary goods. Only if purchasers of pizza and sub franchises were forced to buy Defendants' commissary goods as a result of Defendants' market power would the arrangement have anticompetitive consequences. *Jefferson Parish,* 466 U.S. at 25, 104 S.Ct. at 1565.

Defendants have franchised thirty-six pizza and sub stores in Georgia and have provided the court with evidence of the many other pizza, sub and Italian restaurants in the Atlanta area. Plaintiffs were free to buy the franchises of competitors and have submitted no evidence to contradict Defendants' denial of market power.

In *Tic–X–Press v. Omni Promotions Company of Georgia* the 11th Circuit recently emphasized the importance of considering the markets in this context. *Id.,* 815 F.2d at 1417. The court found an illegal tying agreement based on evidence that lease of the Omni Coliseum, the only enclosed arena in Atlanta with a seating capacity of over 4,000, was conditioned on the use of SEATS, a computerized ticket selling agency. One of the reasons for this finding was that the Omni was unique in its size. *See also United States Steel Corp. v. Fortner Enterprises, Inc.,* 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977) (emphasizing the importance of uniqueness in the tying product). This created a disincentive for competition in the computerized ticketing market because it was only cheaper than hard ticketing in large arenas. Since Omni ticketing was tied to SEATS, there was no reason for prospective competitors to enter the Atlanta computerized ticketing market. *Tic–X–Press,* at 1417.

In the instant case Plaintiff has presented no evidence that Defendants' position in the pizza restaurant market was such that it created a disincentive for competition in the pizza restaurant supply market. Although competitors in the supply market are subject to Defendants' approval requirement, the record contains no showing that this has had the effect of foreclosing their competition. *Kentucky Fried,* 549 F.2d at 378.

Similarly, Plaintiffs have presented no evidence on the fourth element of proof, the anticompetitive effects in the tied market, to combat Defendants' showing of their position in the marketplace. As noted, Plaintiffs have also failed establish the fifth element of interstate commerce involvement in a not insubstantial amount.

Section 3 of the Clayton Act[6] reaches tying arrangements if the tying product is

---

**6.** This section, 15 U.S.C. § 14, states that:

"It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States

... or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or

a commodity. *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 13 n. 1, 78 S.Ct. 514, 522 n. 1, 2 L.Ed.2d 545. The tying product in this case is the Primo's franchise. It obviously does not fall under the category of "goods, wares, merchandise, machinery, supplies, or other commodities." 15 U.S.C. § 14. Plaintiffs cite sections 12 through 27 as evidence to the contrary. After a careful review of these sections, the court finds that this contention is without merit.

Therefore, since neither the FTC Act, the Sherman Act nor the Clayton Act apply to Plaintiffs' allegations under Count I, it is dismissed.

*The RICO Claims*

■■■ The court now turns to Count II, the RICO allegations. Plaintiffs assert that Defendants violated 18 U.S.C. § 1962(c) by engaging in a pattern of racketeering activity.[7] Specifically, Plaintiffs allege that Defendants committed mail fraud by sending to Plaintiffs' attorney drafts of the franchise agreements, which allegedly contained misrepresentations that Defendants would provide training and operations manuals to employees, inspect the premises, assist in openings, open an escrow account to refund to Plaintiff the franchise costs and allow Plaintiffs to buy products from suppliers other than Defendants. By discussing matters related to the profitability of the franchises, Defendants allegedly committed wire fraud.

Defendants contend that Plaintiffs' allegations of fraud are insufficiently pleaded and that their "enterprise" did not affect interstate commerce. As proof of the latter, Defendants refer to the affidavit of Defendant Troncali which states that all Primo's franchises are within the state of Georgia. Defendants also deny mailing the drafts of the franchise agreements to the

offices of Plaintiffs' attorney; they claim the documents were hand delivered.

To violate section 1962(c) a defendant must engage in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Company, Inc.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). Plaintiffs' allegations are sufficient to withstand any challenge to the first two elements and to interstate commerce involvement. *See Shared Network Technologies, Inc. v. Taylor*, 669 F.Supp. 422, 426 (N.D.Ga.1987) (allegations of a minimal nexus between the enterprise and interstate commerce are sufficient to state a claim).

However, after a review of the record, the court finds that plaintiff has failed to allege a "pattern" of racketeering activity sufficient to withstand Defendants' motion.[8] Congress required a pattern in enacting this section because its target is "not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." *Sedima*, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14 (quoting S.Rep. No. 91–617, p. 158 (1969)) (emphasis added by the Court).

Allegations of at least two acts of racketeering activity are required to establish a pattern. 18 U.S.C. § 1961(5). But "while two acts are necessary, they may not be sufficient" to constitute a pattern. *Sedima* at 496 n. 14, 105 S.Ct. at 3285 n. 14. "Indeed, in common parlance two of anything do not generally constitute a pattern." *Id.*

As noted, Plaintiffs' allegations that Defendants committed mail and wire fraud

---

contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

7. 18 U.S.C. § 1962(c) states that:
   "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or

participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

8. Defendants have styled their motion as a motion to dismiss and motion for summary judgment. The "pattern" issue will be addressed under F.R.C.P. 12(b)(6).

relate entirely to the contents of the franchise agreements and to misrepresentations about the profitability of the restaurants. These allegations, taken as true, constitute a single scheme to defraud.

This circuit has not ruled that a single fraudulent scheme lacks the requisite continuity to establish a pattern. *Cf., e.g., Superior Oil Co. v. Fulmer*, 785 F.2d 252 (8th Cir.1986) (holding that one isolated fraudulent scheme provided insufficient evidence of continuing activity to satisfy RICO). However, the Eleventh Circuit does expressly require "the threat of continuing activity as a prerequisite to finding a pattern." *Sheftelman v. Jones*, 636 F.Supp. 263 (N.D.Ga.1986) (citing *Bank of America National Trust & Savings Association v. Touche Ross & Co.*, 782 F.2d 966, 971 (11th Cir.1986).

The *Touche Ross* court analyzed the relationship between the parties, the number of predicate acts and the time frame in which they occurred to determine the threat of continuing activity. *Id.* Allegations of "nine separate acts of wire and mail fraud, involving the same parties over a period of three years, for the purpose of inducing banks to extend credit" to a corporation were held to constitute a pattern. *Touche Ross*, at 782 F.2d 971.

In applying this same analysis the court finds that Plaintiffs have failed to demonstrate a threat of continuity. The alleged fraudulent acts occurred in June and October of 1987 [9] as part of a single alleged scheme to defraud a single investor. Neither the complaint nor its amendments allege similar conduct on the part of Defendants in the past. *Sheftelman*, 636 F.Supp. at 268. Taken as a whole the facts do not demonstrate the continuity and ongoing design necessary to establish a pattern. *Id.; see SK Hand Tool Corp. v. Dresser Industries, Inc.*, 852 F.2d 936 (7th

Cir.1988) (misrepresentations for the sole purpose of inducing purchaser of business to buy at inflated price do not constitute a pattern of racketeering activity). Therefore, the court GRANTS Defendants' motion to dismiss Count II.

### Remaining State Law Claims

Plaintiffs' other allegations are based on state law. The parties are all Georgia residents. Thus Plaintiffs' remaining claims must be dismissed for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1). Because of this ruling the court will not address the parties' other motions.

Accordingly, Defendants' motion for summary judgment as to Count I and motion to dismiss as to Count II are GRANTED. The clerk is DIRECTED to dismiss the remaining Counts for lack of subject matter jurisdiction.

SO ORDERED.

9. Plaintiff alleges that the acts of mail fraud occurred on or about October 8 and 14, 1988. The court assumes Plaintiff means 1987. The alleged wire fraud occurred "on or about June 3, 1988 and September 23, 1987." This suit was filed on April 22, 1988 and Plaintiffs' amendments to the complaint make no mention of any "transactions or occurrences or events which

have happened since the date of the pleading sought to be supplemented." Fed.R.Civ.P. 15(d). Plaintiffs correctly styled their *Yost* and Rule 11 additions as a supplemental pleading, but the document setting forth these dates is titled a motion to amend. Therefore, the court will assume Plaintiffs mean June 3, 1987.