06-1871-cv
In Re: American Express Merchants' Litigation

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2007

Argued: December 10, 2007                                      Decided: February 1, 2012

Docket No. 06-1871-cv
_____

_____

IN RE: AMERICAN EXPRESS MERCHANTS' LITIGATION,

ITALIAN COLORS RESTAURANT, on or behalf of itself and all
similarly situated persons, NATIONAL SUPERMARKETS ASSOCIATION, 492
SUPERMARKET CORP., BUNDA STARR CORP., PHOUNG CORP.,

*Plaintiffs-Appellants*,

v.

AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, AMERICAN EXPRESS
COMPANY,

*Defendants-Appellees*.[1]
_____

POOLER and SACK, *Circuit Judges*.[2]

_____

[1] The Clerk of the Court is directed to amend the official caption as shown above.

[2] The Honorable Sonia M. Sotomayor, originally a member of this panel, was elevated to
the Supreme Court on August 8, 2009. The remaining two panel members, who are in
agreement, have determined the matter. *See* 28 U.S.C. § 46(d); Second Circuit IOP E(b),
available at http://www.ca2.uscourts.gov/clerk/Rules/IOP/IOP_E.htm; *United States v.
DeSimone*, 140 F.3d 457, 458-59 (2d Cir. 1998).

This case returned to us from the Supreme Court, with our judgment vacated and the case remanded for reconsideration in light of *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758 (2010). Shortly after we issued our decision in *In re American Express Merchants' Litigation*, 634 F.3d 187 (2d Cir. 2011), the Supreme Court addressed the issue of class-action waivers in *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011). As we find neither *Stolt-Nielsen* nor *Concepcion* counsels us to alter our original analysis, we again conclude that (1) the question of the enforceability of the class action waiver provision is properly decided by the court and (2) the class action waiver provision is unenforceable under the Federal Arbitration Act. *See In re Am. Express Merchs. Litig.*, 554 F.3d 300 (2d Cir. 2009). REVERSED AND REMANDED.

_____

*Appearing for Plaintiffs-Appellants*:

Gary B. Friedman, Friedman Law Group LLP (Tracey Kitzman, Aaron Patton, Warren Parrino, *on the brief*), New York, NY.

*Appearing for Defendants-Appellees*:

Bruce H. Schneider, Stroock & Stroock & Lavan, LLP, New York, NY.

Julia B. Strickland, Stephen J. Newman, Stroock & Stroock & Lavan LLP, Los Angeles, CA.

Michael K. Kellogg, Derek T. Ho, Kellogg, Huber, Hansen, Todd, Evans & Figel, PLLC, Washington, DC.

POOLER, *Circuit Judge*:

We turn to this case for the third time, as the Supreme Court released its latest views on class arbitration waivers in *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011), just weeks after we issued our decision in *In re American Express Merchants' Litigation*, 634 F.3d 187 (2d Cir. 2011) ("*Amex II*"). *Amex II* returned to us from the Supreme Court, after defendants American Express Company and American Express Travel Related Services Co. (together, "Amex") sought review from the Supreme Court following our decision in *In re American Express Merchants Litigation*, 554 F.3d 300 (2d Cir. 2009) ("*Amex I*"). In *Amex I*, we considered the enforcement of a mandatory arbitration clause in a commercial contract also containing a

2

"class action waiver," that is, a provision which forbids the parties to the contract from pursuing anything other than individual claims in the arbitral forum. We found the class action waiver unenforceable, "because enforcement of the clause would effectively preclude any action seeking to vindicate the statutory rights asserted by the plaintiffs." *Amex I*, 554 F.3d at 304.

The Supreme Court granted Amex's petition for a writ for certiorari, then vacated and remanded for reconsideration in light of its decision in *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758 (2010). Finding our original analysis unaffected by *Stolt-Nielsen*, we again reversed the district court's decision and remanded for further proceedings. *Amex II*, 634 F.3d at 199-200. On April 11, 2001, we placed a hold on the mandate in *Amex II* in order for Amex to file a petition seeking a writ of certiorari. While the mandate was on hold, the Supreme Court issued its decision in *Concepcion*, 131 S. Ct. 1740 (2011). The *Concepcion* Court held that the Federal Arbitration Act preempted a California law barring the enforcement of class action waivers in consumer contracts. *Id.* at 1750-51. The parties submitted supplemental briefing discussing the impact, if any, of *Concepcion* on our previous decisions, and we find oral argument unnecessary. As discussed below, *Concepcion* does not alter our analysis, and we again reverse the district court's decision and remand for further proceedings.

## BACKGROUND

Because the only issue before us is the narrow question of whether the class action waiver provision contained in the contract between the parties should be enforced, we provide but a brief recitation of the facts.

### A.    Procedural Posture.

The plaintiffs appealed from the March 20, 2006 judgment of the United States District Court for the Southern District of New York, which granted Amex's motion to compel arbitration pursuant to the Federal Arbitration Act ("FAA") and Federal Rule of Civil Procedure 12(b).  *See In re Am. Express Merchs. Litig.*, No. 03 CV 9592, 2006 WL 662341 (S.D.N.Y. Mar. 16, 2006) (Daniels, *J.*).

### B.    The Parties.

The amended complaint alleges that Amex "is the leading issuer of general purpose and corporate charge cards to consumers and businesses in the United States and throughout the world.  It is also the leading provider of charge card services to merchants."  The named plaintiffs are: (1) California and New York corporations which operate businesses which have contracted with Amex and (2) the National Supermarkets Association, Inc. ("NSA"), "a voluntary membership-based trade association that represents the interests of independently owned supermarkets."

The named plaintiffs seek to represent the following class:

> all merchants that have accepted American Express charge cards (including the American Express corporate card), and have thus been forced to agree to accept American Express credit and debit cards, during the longest period of time permitted by the applicable statute of limitations . . . throughout the United States. . . .

### C.    The Plaintiffs' Substantive Claims.

The plaintiffs' dispute with Amex rests upon the distinction between "charge cards" and "credit cards."[3]  The district court explained the distinction:

---

[3] Plaintiffs bring claims pursuant to both the Sherman and Clayton Acts, 15 U.S.C. § 1 et seq., which bar certain anticompetitive conduct in trade.

A charge card requires its holder to pay the full outstanding balance at the end of a standard billing cycle. A credit card, by contrast, allows the cardholder to pay a portion of the amount owing at the close of a billing cycle, subject to interest charges. In plain terms, the credit card is a means of financing purchases, the charge card is a method of payment.

*In re Am. Express Merchs.*, 2006 WL 662341, at * 1, n. 6.

According to the plaintiffs, Amex had until recent years centered its business on the issuance of corporate and personal charge cards to corporate clients and affluent consumers. The plaintiffs further assert that "[h]olders of charge cards are more affluent than credit cardholders, and a vastly higher percentage of charge cards than credit cards are held by businesses and used for business travel and other corporate purposes." In fact, the plaintiffs allege that Amex itself contends that "the average purchase on an American Express card is 17% higher than the average purchase made on a credit card." Thus, the holder of a charge card is likely to be "a higher class of customer" and, as such, is particularly attractive to merchants such as the plaintiffs.

As a result of this distinction, Amex has traditionally been able to charge high "merchant discount fees," which are the fees a card issuer withholds as a percentage of each purchase made with its card at the merchant's establishment. These fees, the plaintiffs aver, "are at least 35% higher than competitive rates" applicable to mass-market credit cards such as Visa, MasterCard, and Discover. Over the last decade, the plaintiffs allege, Amex's "business in the markets for credit card issuance and credit card services has grown dramatically." By leveraging its market power in corporate and personal charge cards, however, plaintiffs allege that American Express was able to compel merchants to accept "its new revolving credit card product[s] at the same elevated discount rate, which vastly exceeded the rate for comparable Visa, MasterCard or Discover products."

5

According to the plaintiffs, the vehicle of this compulsion is the "Honor All Cards" provision contained in the Card Acceptance Agreement. Under the Agreement, a merchant does not contract to accept any one Amex product as a form of payment. Rather, the Agreement applies:

> to your acceptance of American Express© Cards . . . . American Express Card(s) ... shall mean any card or other account access device issued by American Express Travel Related Services Company, Inc., or its subsidiaries or affiliates or its or their licensees bearing the American Express name or an American Express trademark, service mark or logo.

The plaintiffs assert that, by means of the "Honor All Cards" provision, merchants are faced with the choice of paying supracompetitive merchant discount fees (i.e., fees above competitive levels) on Amex's new mass-market products or "inevitably los[ing] a significant portion of the sales they receive from businesses, travelers, affluent consumers, and others" who are the traditional users of Amex charge cards. This, the plaintiffs claim, amounts to an illegal "tying arrangement," in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.[4]

**D.      The Card Acceptance Agreement.**

The basic contractual relationship between Amex and the plaintiffs was set forth in an affidavit of an Amex executive:

---

[4] In a definition that has become classic, the Supreme Court has defined a tying arrangement as "an agreement by a party to sell one product but only on the condition that the buyer also purchases a different (or tied) product, or at least agrees that he will not purchase that product from any other supplier." *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5-6 (1958). A tying arrangement will violate Section 1 of the Sherman Act if "the seller has appreciable economic power in the tying product market and if the arrangement affects a substantial volume of commerce in the tied market." *Eastman Kodak Co. v. Image Technical Servs.*, 504 U.S. 451, 462 (1992) (internal quotation marks omitted).

> American Express issues card products to its cardmembers, which cardmembers then use in making purchases from participating merchants. Participating merchants with annual charge volume expected to be less than $10 million agree that, by submitting charges for payment by American Express, their relationship will be governed by the "Terms and Conditions for American Express© Card Acceptance" ("the Card Acceptance Agreement").

The Card Acceptance Agreement is a standard form contract issued by Amex. It may be terminated by either party "at any time by sending written notice to the other party." Further, Amex reserves the right:

> to change this Agreement at any time. We will notify you of any change in writing at least ten (10) calendar days in advance. If the changes are unacceptable to you, you may terminate this Agreement as described in the section entitled "TERMINATING THIS AGREEMENT."

According to Amex, the Card Acceptance Agreement has "expressly permitted amendments upon notice" for more than twenty-five years. The Card Acceptance Agreement also contains a choice of law provision designating New York law as governing and, as Amex states, there is no dispute that the agreement "has always" contained this provision.

By contrast, it is only since 1999 that the Card Acceptance Agreement has contained a mandatory arbitration clause:

> For the purpose of this Agreement, Claim means any assertion of a right, dispute or controversy between you and us arising from or relating to this Agreement and/or the relationship resulting from this Agreement. Claim includes claims of every kind and nature including, but not limited to, initial claims, counterclaims, cross-claims and third-party claims and claims based upon contract, tort, intentional tort, statutes, regulations, common law and equity. We shall not elect to use arbitration under this arbitration provision for any individual Claim that you properly file and pursue in a small claims court of your state or municipality so long as the Claim is pending only in that court.
> . . .

7

Any Claim shall be resolved upon the election by you or us, by arbitration pursuant to this arbitration provision and the code of procedure of the national arbitration organization to which the Claim is referred in effect at the time the Claim is filed. Claims shall be referred to the National Arbitration Forum (NAF), JAMS/Endispute (JAMS), or the American Arbitration Association (AAA), as selected by the party electing to use arbitration. If a selection by us of one of these organizations is unacceptable to you, you shall have the right within thirty (30) days after you receive notice of our election to select one of the other organizations listed to serve as arbitrator administrator.

At the heart of the instant appeal is the following provision contained in the Agreement:

IF ARBITRATION IS CHOSEN BY ANY PARTY WITH RESPECT TO A CLAIM, NEITHER YOU NOR WE WILL HAVE THE RIGHT TO LITIGATE THAT CLAIM IN COURT OR HAVE A JURY TRIAL ON THAT CLAIM. . . . FURTHER, YOU WILL NOT HAVE THE RIGHT TO PARTICIPATE IN A REPRESENTATIVE CAPACITY OR AS A MEMBER OF ANY CLASS OF CLAIMANTS PERTAINING TO ANY CLAIM SUBJECT TO ARBITRATION. THE ARBITRATOR'S DECISION WILL BE FINAL AND BINDING. NOTE THAT OTHER RIGHTS THAT YOU WOULD HAVE IF YOU WENT TO COURT MAY ALSO NOT BE AVAILABLE IN ARBITRATION.

There shall be no right or authority for any Claims to be arbitrated on a class action basis or on any basis involving Claims brought in a purported representative capacity on behalf of the general public, other establishments which accept the Card (Service Establishments), or other persons or entities similarly situated. Furthermore, Claims brought by or against a Service Establishment may not be joined or consolidated in the arbitration with Claims brought by or against any other Service Establishment(s), unless otherwise agreed to in writing by all parties.

(emphasis in the original). The Card Acceptance Agreement thus not only precludes a merchant from bringing a class action lawsuit, it also precludes the signatory from having any claim arbitrated on anything other than an individual basis.

### E. The District Court's Decision.

Amex moved to compel arbitration pursuant to the terms of the Card Acceptance Agreement. In its March 16, 2006 opinion, the district court granted Amex's motion, first holding that the arbitration clause in the Agreement was "a paradigmatically broad clause" which was certainly applicable to the dispute between the parties. *In re Am. Express Merchs. Litig.*, 2006 WL 662341, at *4. The district court also held that "[t]he enforceability of the collective action waivers is a claim for the arbitrator to resolve. Issues relating to the enforceability of the contract and its specific provisions are for the arbitrator, once arbitrability is established." *Id.* at *6. Thus, the district court concluded that all of the plaintiffs' substantive antitrust claims, as well the question of whether or not the class action waivers were enforceable, were subject to arbitration. Having so decided, the district court dismissed plaintiffs' cases against Amex. *Id.* at *10.

### F. Our Original Decision, *Amex I*.

The plaintiffs filed a timely appeal. We first decided that the issue of the class action waiver's enforceability was a matter for the court, not the arbitrator. *Amex I*, 554 F.3d at 310. Neither party takes issue with that holding, which we find survives *Stolt-Nielsen* and *Concepion*.

Turning to the question of whether the class action waiver in the Card Acceptance Agreement was enforceable, we found that *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79 (2000), controlled our analysis:

> to the extent that [*Green Tree*] holds that when "a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." 531 U.S. at 92, 121 S. Ct. 513. We find that the district court erred in ruling that the plaintiffs had failed to bear this burden because they had "ignore[d]

9

the statutory protections provided by the Clayton Act." *In re American Express Merchants Litigation*, 2006 WL 662341, at \*5. On the contrary, the record abundantly supports the plaintiffs' argument that they would incur prohibitive costs if compelled to arbitrate under the class action waiver. The Card Acceptance Agreement therefore entails more than a speculative risk that enforcement of the ban will deprive them of substantive rights under the federal antitrust statutes.

*Amex I*, 554 F.3d at 315-16. Based in part on plaintiffs' submission of an affidavit from an economist detailing the fiscal impracticality of pursuing individual claims, we concluded that:

[since] Amex has brought no serious challenge to the plaintiffs' demonstration that their claims cannot reasonably be pursued as individual actions, whether in federal court or in arbitration, we find ourselves in agreement with the plaintiffs' contention that enforcement of the class action waiver in the Card Acceptance Agreement "flatly ensures that no small merchant may challenge American Express's tying arrangements under the federal antitrust laws." The effective negation of a private suit under the antitrust laws is troubling because such "private suits provide a significant supplement to the limited resources available to the Department of Justice for enforcing the antitrust laws and deterring violations." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 344, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979).

*Id.* at 319. Thus, we held that:

the class action waiver in the Card Acceptance Agreement cannot be enforced in this case because to do so would grant Amex de facto immunity from antitrust liability by removing the plaintiffs' only reasonably feasible means of recovery. As already set forth, Section 2 of the [Federal Arbitration Act], 9 U.S.C. § 2, provides that an agreement to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." Given that we believe that a valid ground exists for the revocation of the class action waiver, it cannot be enforced under the FAA.

*Id.* at 320. Amex timely filed a petition for a writ of certiorari. *Am. Express Co. v. Italian Colors Rest.*, 130 S. Ct. 2401 (2010). The Supreme Court granted Amex's petition, vacated our original decision, and remanded for further consideration in light of its holding in *Stolt-Nielsen*.

10

### G.     The *Stolt-Nielsen* Decision.

In *Stolt-Nielsen*, petitioners were shipping companies. *See* 130 S. Ct. at 1764. The charter

party – a maritime contract governing the relationship between the parties – provided, in relevant

part

> Arbitration. Any dispute arising from the making, performance or termination of this Charter Party shall be settled in New York, Owner and Charterer each appointing an arbitrator, who shall be a merchant, broker or individual experienced in the shipping business; the two thus chosen, if they cannot agree, shall nominate a third arbitrator who shall be an Admiralty lawyer. Such arbitration shall be conducted in conformity with the provisions and procedure of the United States Arbitration Act [ i.e., the FAA], and a judgment of the Court shall be entered upon any award made by said arbitrator.

*Id.* at 1765. Respondent AnimalFeeds, along with other charterers, sued Stolt-Nielsen, alleging

price fixing, and eventually served a demand for class arbitration. *Id.* The parties agreed to have

an arbitration panel decide the threshold issue of whether the charter party permitted class

arbitration, and stipulated before the panel that the arbitration clause was silent on the issue of

class arbitration. *Id.* at 1765-66. The panel concluded that the expert testimony offered did not

demonstrate an "inten[t] to preclude class arbitration." *Id.* (alteration in original). After finding

that the issue was controlled by the Supreme Court's decision in *Green Tree Fin. Corp. v. Bazzle*,

539 U.S. 444, (2003), the panel concluded *Bazzle* and policy considerations dictated finding the

clause permitted class arbitration. *Id.*

The Supreme Court found that the arbitration panel "imposed its own policy choice,"

rather than "identifying and applying a rule of decision derived from the FAA or either maritime

or New York law," and "thus exceeded its powers." 130 S. Ct. at 1770. Tackling the issue itself,

the Court found the FAA controlling, *id.* at 1773, and reaffirmed that "arbitration is simply a

matter of contract between the parties." *Id.* at 1774 (alterations omitted). The Court concluded that "a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party *agreed* to do so." *Id.* at 1775 (emphasis in the original).

### H.     Our Decision in *Amex II*.

On remand from the Supreme Court, we found *Stolt-Nielsen* did not require us to depart from our original analysis. The key issue, we concluded, was whether the mandatory class action waiver in the Card Acceptance Agreement is enforceable even if the plaintiffs are able to demonstrate that the practical effect of enforcement of the waiver would be to preclude their bringing Sherman Act claims against Amex. *In re American Express Merchants' Litigation*, 634 F.3d 187, 196 (2d Cir. 2011). We concluded enforcement of the class action waiver would indeed bar plaintiffs from pursuing their statutory claims because the "record evidence before us establishe[d], as a matter of law, that the cost of plaintiffs' individually arbitrating their dispute with Amex would be prohibitive, effectively depriving plaintiffs of the statutory protections of the antitrust laws." *Id.* at 197-98.

We relied on detailed testimony from Gary L. French, Ph.D., an economist associated with Nathan Associates Inc., a financial consulting firm retained by the plaintiffs. Dr. French submitted a detailed affidavit to the district court, in which he opined, inter alia, that "[i]n my experience, even a relatively small economic antitrust study will cost at least several hundred thousand dollars, while a larger study can easily exceed $1 million. . . . . after reviewing the complaint and doing some preliminary research in this case, it is my opinion that . . . the cost for this case will fall in the middle of the range . . . ." (Joint Appendix at p. 362-63, ¶ 4). Dr. French

12

then opined that it was not economically rational to pursue an individual action against Amex in light of these substantial expert witness costs. (Joint Appendix at p. 365, ¶10-11). *Amex II*, 634 F.3d at 198. We found that "Dr. French's affidavit demonstrates that the only economically feasible means for enforcing their statutory rights is via a class action," and remanded the case to the district court. *Id.*

## ANALYSIS

Shortly after we issued our opinion in *Amex II*, the Supreme Court handed down its opinion in *Concepcion*, 131 S.Ct. at 1740. In *Concepcion,* the Supreme Court held that the FAA preempted California common law deeming most class-action arbitration waivers in consumer contracts unconscionable. *Id.* at 1746. Amex argues that *Concepcion* applies a fortiori here, requiring reversal of our holding in *Amex II*. It is tempting to give both *Concepcion* and *Stolt-Nielsen* such a facile reading, and find that the cases render class action arbitration waivers per se enforceable. But a careful reading of the cases demonstrates that neither one addresses the issue presented here: whether a class-action arbitration waiver clause is enforceable even if the plaintiffs are able to demonstrate that the practical effect of enforcement would be to preclude their ability to vindicate their federal statutory rights.

The specific preemption question addressed by the Supreme Court in *Concepcion* was "whether the FAA prohibits States from conditioning the enforceability of certain arbitration agreements on the availability of classwide arbitration procedures." *Id.* at 1744. Under California's common law, class action waivers contained in arbitration clauses were regularly found unconscionable, especially in consumer contracts. *Id.* at 1746. The Supreme Court began its analysis by reaffirming the "liberal federal policy favoring arbitration agreements,

13

notwithstanding any state substantive or procedural policies to the contrary." *Id*. at 1749 (internal quotation marks). By requiring the "availability of classwide arbitration," the Court held, the California rule "interfere[d] with fundamental attributes of arbitration and thus create[d] a scheme inconsistent with the FAA." *Id.* at 1748. In response to the dissent's discussion of the benefits of class-arbitration as a means of addressing multiple small claims, the majority concluded that "[s]tates cannot require a procedure that is inconsistent with the FAA, even if it is desirable for unrelated reasons." *Id*. at 1753.

*Concepcion* plainly offers a path for analyzing whether a state contract law is preempted by the FAA. Here, however, our holding rests squarely on "a vindication of statutory rights analysis, which is part of the federal substantive law of arbitrability." *Amex I*, 554 F.3d at 320; *see also Kristian v. Comcast Corp.*, 446 F.3d 25, 47-48 (1st Cir. 2006) (severing as unenforceable provision of arbitration agreement limiting availability of treble damages under antitrust statute); *Hadnot v. Bay, Ltd.*, 344 F.3d 474, 478 n.14 (5th Cir. 2003) (severing restriction on available remedies from arbitration agreement after finding that "ban on punitive and exemplary damages is unenforceable in a Title VII case"); *Paladino v. Avnet Computer Techs., Inc.*, 134 F.3d 1054, 1062 (11th Cir. 1998) (holding that "[w]hen an arbitration clause has provisions that defeat the remedial purpose of the statute . . . the arbitration clause is not enforceable" and language insulating employer from damages and equitable relief rendered clause unenforceable).

*Concepcion* and *Stolt-Nielsen*, taken together, stand squarely for the principle that parties cannot be forced to arbitrate disputes in a class-action arbitration unless the parties agree to class action arbitration. *Concepcion*, 131 S.Ct. at 1750-51 ("class arbitration, to the extent it is

manufactured by [state law] rather than consensual, is inconsistent with the FAA")[5]; *Stolt-Nielsen*, 130 S.Ct. at 1775 ("a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party agreed to do so."). We plainly acknowledged in *Amex II* that we could not, and thus were not, ordering the parties to participate in class arbitration. 634 F.3d at 200 ("*Stolt-Nielsen* plainly precludes us from ordering class-wide arbitration.").

What *Stolt-Nielsen* and *Concepcion* do not do is require that all class-action waivers be deemed per se enforceable. That leaves open the question presented on this appeal: whether a mandatory class action waiver clause is enforceable even if the plaintiffs are able to demonstrate that the practical effect of enforcement would be to preclude their ability to bring federal antitrust claims. While we cannot rely on *Concepcion* or *Stolt-Nielsen* to answer the question before us, we continue to find useful guidance in other Supreme Court decisions addressing the issue of vindicating federal statutory rights via arbitration.

---

[5] In *Compucredit Corp. v. Greenwood*, 10-948, – S.Ct. –, 2012 WL 43517 (Jan. 10, 2012), the Supreme Court addressed whether the Credit Repair Organizations Act, 15 U.S.C. § 1679, et seq., precluded enforcement of an arbitration agreement. The Court concluded that because the Act is silent on whether claims brought under the Act can be arbitrated, the FAA requires that the arbitration agreement be enforced according to its terms. *Id.* at *4 -* 6. To support its analysis, the Court cited to a number of statutes that "restrict[] the use of arbitration. *Id.* Plaintiffs here do not allege that the Sherman Act expressly precludes arbitration or that it expressly provides a right to bring collective or class actions, but instead argue that enforcement of the class arbitration waiver would effectively deprive them of their ability to vindicate their statutory rights.

As aptly noted by Justice Sotomayor's concurrence in *Compucredit*, the majority's opinion does not "hold that Congress must speak so explicitly in order to convey its intent to preclude arbitration of statutory claims." *Id.* at *8. Indeed, the Supreme Court has "on numerous occasions . . . held that proof of Congress' intent may also be discovered in the history or purpose of the statute in question." *Id.* at *8. Although the Sherman Act does not provide plaintiffs with an express right to bring their claims as a class in court, forcing plaintiffs to bring their claims individually here would make it impossible to enforce their rights under the Sherman Act and thus conflict with congressional purposes manifested in the provision of a private right of action in the statute.

15

We begin our analysis with the well-settled rule that class action lawsuits are suitable as a vehicle for vindicating statutory rights. Supreme Court precedent recognizes that the class action device is the only economically rational alternative when a large group of individuals or entities has suffered an alleged wrong, but the damages due to any single individual or entity are too small to justify bringing an individual action. The Court made the point forcefully more than thirty years ago in the context of an antitrust action:

> A critical fact in this litigation is that petitioner's individual stake in the damages award he seeks is only $70. No competent attorney would undertake this complex antitrust action to recover so inconsequential an amount. Economic reality dictates that petitioner's suit proceed as a class action or not at all.

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 161 (1974). As the Court later opined, "'[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights.'" *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (7th Cir. 1997)); *see also Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 338 (1980) ("[A class action] may motivate [plaintiffs] to bring cases that for economic reasons might not be brought otherwise . . . [,thereby] vindicating the rights of individuals who otherwise might not consider it worth the candle to embark on litigation in which the optimum result might be more than consumed by the cost.") (footnote omitted); *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004) ("[T]he realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30." (emphasis omitted)).

16

Arbitration is also recognized as an effective vehicle for vindicating statutory rights, but only "so long as the prospective litigant may *effectively* vindicate its statutory cause of action in the arbitral forum." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 632 (1985) (emphasis added). Indeed, in dicta the *Mitsubishi* Court noted that should clauses in a contract operate "as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy." *Id.* at 637, n.19. As we observed in *Amex II*:

> While dicta, it is dicta based on a firm principle of antitrust law that an agreement which in practice acts as a waiver of future liability under the federal antitrust statutes is void as a matter of public policy. More than a half-century ago, the Supreme Court stated that "in view of the public interest in vigilant enforcement of the antitrust laws through the instrumentality of the private treble-damage action," an agreement which confers even "a partial immunity from civil liability for future violations" of the antitrust laws is inconsistent with the public interest. *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 329 (1955); *see also Minnesota Mining and Mfg. Co. v. Graham-Field, Inc.*, No. 96 cv 3839, 1997 WL 166497, at *3 (S.D.N.Y. Apr. 9, 1997) ("GFI could not have waived [its antitrust] claim in the releases because a prospective waiver of an antitrust claim violates public policy.").

634 F.3d at 197.

Applying its rule regarding the arbitrability of federal statutory claims from *Mitsubishi*, in *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991), the Supreme Court permitted the arbitration, rather than litigation, of a plaintiff's Age Discrimination in Employment Act claim. *Id.* at 28 (quoting *Mitsubishi Motors*, 473 U.S. at 637). In *Gilmer*, the Court concluded that the plaintiff in that case could effectively vindicate his asserted rights in the arbitral forum. The plaintiff, a manager at a brokerage firm, asserted that he had been terminated by the firm in violation of the ADEA. *Id.* at 23. After the plaintiff filed suit in federal district court, the

17

defendant firm moved to compel arbitration pursuant to a mandatory arbitration provision contained in the rule of the New York Stock Exchange ("NYSE"), to which the plaintiff had agreed to be bound when he became a registered securities representative. *Id.* at 23-24. The *Gilmer* Court held that because "[i]t is by now clear that statutory claims may be the subject of an arbitration agreement," the arbitration clause was enforceable "unless Congress itself has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue." *Id.* at 26 (quoting *Mitsubishi*, 473 U.S. at 628).

The Court rejected plaintiff's contention that "arbitration procedures cannot further the purposes of the ADEA because they do not provide for broad equitable relief and class actions." *Id.* at 32. Rather, the Court found that:

> arbitrators do have the power to fashion equitable relief. Indeed, the NYSE rules applicable here do not restrict the types of relief an arbitrator may award, but merely refer to "damages and/or other relief." The NYSE rules also provide for collective proceedings. But even if the arbitration could not go forward as a class action or class relief could not be granted by the arbitrator, the fact that the ADEA provides for the possibility of bringing a collective action does not mean that individual attempts at conciliation were intended to be barred.

*Id.* (citations, internal quotation marks, and brackets omitted).[6]

*Gilmer's* conclusion that where the plaintiff's statutory rights could effectively be vindicated through arbitration does not affect the case before us, because here plaintiffs have

---

[6] The Amex plaintiffs do not proffer the argument rejected in *Gilmer* – namely, that the class action waiver in the Card Acceptance Agreement is enforceable because the relevant statute allows class actions. "Rather, the conundrum presented by the instant appeal is more nuanced: whether the mandatory class action waiver in the Card Acceptance Agreement is enforceable even if the plaintiffs are able to demonstrate that the practical effect of enforcement of the waiver would be to preclude their bringing Sherman Act claims against Amex in either an individual or collective capacity." *Amex II*, 634 F.3d at 196.

18

demonstrated that their statutory rights cannot be vindicated through individual arbitrations.

Nearly a decade after *Gilmer*, in *Green Tree Financial Corp.-Alabama v. Randolph*, the Supreme

Court acknowledged in dicta "that the existence of large arbitration costs could preclude a litigant

. . . from effectively vindicating her federal statutory rights in the arbitral forum." 531 U.S. 79,

90 (2000). Among the costs at issue were "payment of filing fees, arbitrators' costs, and other

arbitration expenses." *Id.* at 84. In the end, the *Green Tree* Court found plaintiff failed to submit

sufficient evidence to demonstrate the costs of arbitration would effectively prohibit her from

vindicating her statutory rights, dooming her attempt to have the arbitration clause declared

unenforceable:

> It would also conflict with our prior holdings that the party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration. We have held that the party seeking to avoid arbitration bears the burden of establishing that Congress intended to preclude arbitration of the statutory claims at issue. Similarly, we believe that where, as here, a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs. Randolph did not meet that burden. How detailed the showing of prohibitive expense must be before the party seeking arbitration must come forward with contrary evidence is a matter we need not discuss; for in this case neither during discovery nor when the case was presented on the merits was there any timely showing at all on the point.

*Id.* at 91-92.

As the Tenth Circuit explained:

> Thus, *Gilmer* reaffirmed the Arbitration Act's presumption in favor of enforcing agreements to arbitrate-even where those agreements cover statutory claims. While we recognize this presumption, we conclude that it is not without limits. As *Gilmer* emphasized, arbitration of statutory claims works because potential litigants have an adequate forum in which to resolve their statutory claims and because the broader social purposes behind the statute are adhered to. This

19

supposition[] falls apart, however, if the terms of an arbitration agreement actually prevent an individual from effectively vindicating his or her statutory rights.

*Shankle v. B-G Maint. Mgmt. of Colo., Inc.*, 163 F.3d 1230, 1234 (10th Cir. 1990) (citations omitted); *see also Paladino v. Avnet Computer Techs., Inc.*, 134 F.3d 1054, 1060 (11th Cir. 1998) (holding that arbitration agreement which proscribed award of Title VII damages was unenforceable because it was fundamentally at odds with the purposes of Title VII); *Cole v. Burns Int'l Sec. Servs.*, 105 F.3d 1465, 1468 (D.C. Cir. 1997) ("We do not read *Gilmer* as mandating enforcement of all mandatory agreements to arbitrate statutory claims; rather we read *Gilmer* as requiring the enforcement of arbitration agreements that do not undermine the relevant statutory scheme.")

Neither *Stolt-Nielsen* nor *Concepcion* overrules *Mitsubishi*, and neither makes mention of *Green Tree*. We continue to find *Green Tree* "controlling here to the extent that it holds that when 'a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs.'" *Amex II*, 634 F.3d at 197 (quoting *Green Tree*, 531 U.S. at 92). Other Circuits permit plaintiffs to challenge class-action waivers on the grounds that prosecuting such claims on an individual basis would be a cost prohibitive method of enforcing a statutory right. *See, e.g.*, *In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274, 285 (4th Cir. 2007) ("[I]f a party could demonstrate that the prohibition on class actions likely would make arbitration prohibitively expensive, such a showing could invalidate an agreement.") (citation omitted); *Livingston v. Assocs. Fin., Inc.*, 339 F.3d 553, 557 (7th Cir. 2003) ("In the present case, the [plaintiffs] have not offered any specific evidence of arbitration costs that they may face in this litigation, prohibitive or otherwise, and

20

have failed to provide any evidence of their inability to pay such costs . . . ."); *Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 503 (4th Cir. 2002) ("[Lead plaintiff] makes no showing of the specific financial status of any of the plaintiffs at the time this action was brought. He provides no basis for a serious estimation of how much money is at stake for each individual plaintiff."). In each of these cases, plaintiffs' attempts to avoid the waiver clause failed because plaintiffs were unable to demonstrate the class-action waivers barred them from vindicating their statutory rights. Their failures speak to the quality of the evidence presented, not the viability of the legal theory. The fact that plaintiffs so often fail in their attempts to overturn such waivers demonstrates that the evidentiary record necessary to avoid a class-action arbitration waiver is not easily assembled, and that the courts are capable of the scrutiny such arguments require.

Thus, we continue to find *Green Tree* "controlling here to the extent that it holds that when 'a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs.'" *Amex I*, 554 F.3d at 315 (quoting *Green Tree*, 531 U.S. at 92). Since there is no indication in *Stolt-Nielsen* or *Concepcion* that the Supreme Court intended to overturn either *Green Tree* or *Mitsubishi*, both cases retain their binding authority. *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

The evidence presented by plaintiffs here establishes, as a matter of law, that the cost of plaintiffs' individually arbitrating their dispute with Amex would be prohibitive, effectively

21

depriving plaintiffs of the statutory protections of the antitrust laws. Dr. French stated that the purpose of his affidavit was "to provide an expert opinion concerning the likely costs and complexity of an expert economic study concerning the liability and damages" relating to this action, and to "provide my opinion as to whether it would be economically rational for such a merchant to pursue recovery of damages given the likely out-of-pocket costs of the arbitration or litigation proceeding." (Joint Appendix, at p. 362, ¶ 4)

Dr. French continued:

> In summary, the cost of [Nathan Associates'] expert assistance in individual plaintiff antitrust cases has ranged from about $300 thousand to more than $2 million. However, after reviewing the complaint and doing some preliminary research in this case, it is my opinion that . . . the cost for this case will fall in the middle of the range of [Nathan Associates'] experience.

(Joint Appendix at p. 362–63, ¶ 4) Dr. French then considered the economic rationality of bringing an individual action against Amex in light of these substantial expert witness costs:

> The median volume merchant, with half of the named plaintiffs having more and half having less American Express charge volume, and having reported $230,343 American Express Card volume in 2003, might expect four-year damages of $1,751, or $5,252 when trebled.... The largest volume named plaintiff merchant, with reported American Express Card volume of $1,690,749 in 2003, might expect four-year damages of $12,850, or $38,549 when trebled.
>
> In my opinion as a professional economist ... it would not be worthwhile for an individual plaintiff ... to pursue individual arbitration or litigation where the out-of-pocket costs, just for the expert economic study and services, would be at least several hundred thousand dollars, and might exceed $1 million.

(Joint Appendix at p. 365, ¶ 10–11)

Dr. French's affidavit demonstrates that the only economically feasible means for plaintiffs enforcing their statutory rights is via a class action. As discussed in our earlier opinion,

22

the district court did not directly address Dr. French's affidavit, focusing instead on the damages provision of the Clayton Act, 15 U.S.C. § 15(a). *See Amex I*, 554 F.3d at 317. We found that while the Clayton Act does provide for treble awards along with the recovery of attorneys' fees and expenses, that was unlikely to assist plaintiffs where, as here, "the trebling of a small individual damages award is not going to pay for the expert fees Dr. French has estimated will be necessary to make an individual plaintiff's case." *Id.* We also found the Clayton Act's fee-shifting provisions inadequate to alleviate our concerns given the low expert witness reimbursement rate. *Id.* at 318. "Even with respect to reasonable attorney's fees, which are shifted under Section 4 of the Clayton Act, the plaintiffs must include the risk of losing, and thereby not recovering any fees, in their evaluation of their suit's potential costs." *Id.*

We again find "Amex has brought no serious challenge to the plaintiffs' demonstration that their claims cannot reasonably be pursued as individual actions, whether in federal court or in arbitration." *Amex I*, 554 F.3d at 319. The "enforcement of the class action waiver in the Card Acceptance Agreement 'flatly ensures that no small merchant may challenge American Express[s tying arrangements under the federal antitrust laws.'" *Id.* Eradicating the private enforcement component from our antitrust law scheme cannot be what Congress intended when it included strong private enforcement mechanisms and incentives in the antitrust statutes. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 344 (1979) ("[P]rivate suits provide a significant supplement to the limited resources available to the Department of Justice for enforcing the antitrust laws and deterring violations."); *see also* Dando B. Cellini, *An Overview of Antitrust Class Actions*, 49 Antitrust L.J. 1501, 1506 (1980) (discussing private, class action antitrust lawsuits and observing that "it is obvious from the experience over the last fifteen years since the 1966 amendments to

23

Rule 23 were adopted that linking an antitrust claim with a class action allegation can be devastatingly effective.”).

Thus, as the class action waiver in this case precludes plaintiffs from enforcing their statutory rights, we find the arbitration provision unenforceable.  We again emphasize our holding comes with caveats.  *See Amex I*, 554 F.3d at 320 (“We emphasize two important limitations upon our holding.”)  Our decision in no way relies upon the status of plaintiffs as “small” merchants. We rely instead on the need for plaintiffs to have the opportunity to vindicate their statutory rights.  *See, e.g.*, *Raniere v. Citigroup, Inc.*, No. 11 Civ. 2248, 2011 WL 5881926, at *13 (S.D.N.Y.  Nov. 22, 2011) (“even if *AT & T* is read broadly to acquiesce to the enforcement of an arbitral agreement that as a practical matter would prevent the vindication of state rights in the name of furthering the strong federal policy favoring arbitration, that would not alter the validity of the federal statutory rights analysis articulated in *Mitsubishi*, *Green Tree* [and] *American Express*”); *Chen-Oster v. Goldman, Sachs & Co.*, No. 10 CIV 6950, 2011 WL 2671813, at *2-5 (S.D.N.Y. July 7, 2011) (declining to apply *Concepcion* where the question before the court involved the plaintiff’s ability to vindicate a federal statutory right);  *Sutherland v. Ernst & Young, LLP*, 768 F. Supp. 2d 547, 550-55 (S.D.N.Y. 2011)(finding *Amex I* “retains its persuasive force” following *Stolt-Nielsen*).

We do not hold today that class action waivers in arbitration agreements are per se unenforceable, or even that they are per se unenforceable in the context of antitrust actions. Rather, as demonstrated by the different outcomes in our sister Circuits, we hold that each waiver must be considered on its own merits, based on its own record, and governed with a healthy regard for the fact that the FAA “is a congressional declaration of a liberal federal policy favoring arbitration agreements.”  *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24.

24

Our earlier opinion refrained from ordering the parties to submit to class arbitration, instead permitting Amex the choice between arbitration and litigation. *Amex I*, 554 F.3d at 321. *Stolt-Nielsen* plainly precludes any court from compelling the parties to submit to class-wide arbitration where the arbitration clause is silent as to class-wide arbitration. 130 S.Ct. at 1775 (a party does not agree "to submit to class arbitration unless there is a contractual basis for concluding that a party agreed to do so").

Which leads to the issue of how to proceed from here. As detailed above, we are persuaded by the record before us that if plaintiffs cannot pursue their allegations of antitrust law violations as a class, it is financially impossible for the plaintiffs to seek to vindicate their federal statutory rights. Since the plaintiffs cannot pursue these claims as class arbitration, either they can pursue them as judicial class action or not at all. If they are not permitted to proceed in a judicial class action, then, they will have been effectively deprived of the protection of the federal antitrust-law. The defendant will thus have immunized itself against all such antitrust liability by the expedient of including in its contracts of adhesion an arbitration clause that does not permit class arbitration, irrespective of whether or not the provision explicitly prohibits class arbitration.

Therefore, in light of the fact that the arbitration provision at issue here does not allow for class arbitration, under *Stolt-Nielsen* and by its terms, if the provision were enforced it would strip the plaintiffs of rights accorded them by statute. We conclude that this arbitration clause is unenforceable. We remand to the district court with the instruction to deny the defendant's motion to compel arbitration.

**CONCLUSION**

For the reasons given above, the decision of the district court is reversed. We remand to the district court for further proceedings consistent with this opinion.